UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GREGORY ACKERMAN,

        Plaintiff,                                    Case No. 17-cv-11779

v.                                                    Honorable Thomas L. Ludington

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al

        Defendant.

_____/

**ORDER DENYING MOTIONS TO COMPLETE AND/OR SUPPLEMENT THE ADMINISTRATIVE RECORD**

On June 5, 2017, a group of farmers and incorporated farms filed suit against a number of insurance companies, the United States Department of Agriculture, the Risk Management Agency, and the Federal Crop Insurance Corporation. ECF No. 1. The Plaintiffs are dry bean farmers in Michigan, Minnesota, and North Dakota who have not received indemnity for crop insurance to which they believe they are entitled.

On November 22, 2017, the Federal Defendants and Insurance Defendants both filed motions to dismiss. ECF Nos. 51, 52. On March 8, 2018, Plaintiffs filed a motion for leave to file a second amended complaint correcting the names of certain Plaintiffs. ECF No. 64. On April 18, 2018, the Court issued an order granting the motions to dismiss and also granting the motion for leave to file an amended complaint. ECF No. 70. In that order, the Court dismissed without prejudice all Plaintiffs who do not farm or reside in the Eastern District of Michigan. The Court also dismissed all Insurance Defendants after concluding that Plaintiffs had not complied with the

contractual requirements for bringing suit found within the insurance policies. On April 30, 2018, Plaintiffs filed a second amended complaint. ECF No. 72.

On May 2, 2018, Plaintiffs filed a motion for reconsideration of the Court's order to dismiss. ECF No. 74. In the motion, Plaintiffs argued that the plaintiffs from outside the Eastern District of Michigan should have been transferred to the proper venue instead of dismissed. The motion was granted in part and the Minnesota Plaintiffs were transferred to the District of Minnesota. ECF No. 80.

On October 31, 2018, Plaintiffs filed a motion for supplementation of the administrative record. ECF Nos. 86, 87. Plaintiffs contend that certain information was excluded from the administrative record that is necessary for this Court to make a determination as whether Defendants acted arbitrarily and capriciously. *Id.* For the reasons that follow, the motions for supplementation of the administrative record will be denied.

**I.**

Plaintiffs are bringing this putative class action "on behalf of all dry bean farmers in the Eastern District of Michigan (navy [pea] beans or small red beans)." Second Am. Compl. at 2, ECF No. 72. Each Plaintiff purchased Dry Bean Revenue Endorsement ("DRBE") crop insurance for their dry bean crops in 2015. *Id.* "The purpose of this insurance was to protect dry bean farmers against a market price decline." *Id.* However, even though "dry bean market prices declined greatly in 2015, no indemnity was paid to Plaintiffs." *Id.* In the present suit, Plaintiffs seek a declaratory judgment invalidating certain administrative determinations related to the DBRE and ordering

Defendants to ensure that Plaintiffs' losses are indemnified or their premiums reimbursed. *Id.* at 2–3.

Plaintiffs have named several federal government entities as Defendants. Defendant United States Department of Agriculture ("USDA") "is a department of the United States Government and is the parent agency of Defendant [Risk Management Agency ("RMA")], which in turn administers Defendant [Federal Crop Insurance Corporation ("FCIC")], a wholly government-owned corporation created under the Federal Crop Insurance Act, 7 U.S.C. § 1501, et seq." *Id.* at 14.

**A.**

Pursuant to 7 U.S.C. § 1523(a)(1), the Federal Crop Insurance Corporation may conduct pilot programs for proposed crop insurance. Those proposed programs must be submitted to the FCIC Board. The Board then evaluates "whether a proposal or new risk management tool tested by the pilot program is suitable for the marketplace and addresses the needs of producers of agricultural commodities." 7 U.S.C. § 1523(a)(1). The current dispute arises out of a pilot program developed by "Watts and Associates, a privately owned economic consulting firm located in Billings, Montana." Second Am. Compl. at 15. The FCIC Board approved the program, titled Dry Bean Revenue Endorsement, in 2012 for dry bean crops in Minnesota and North Dakota. *Id.* The pilot program became effective in 2013. *Id.* After initial success, the FCIC approved an expansion of the pilot program, to include farmers in Michigan, effective in 2014. *Id.* Pursuant to that expansion, Michigan dry bean farmers "purchased 1,286 DBRE policies, covering 151,464 acres" in 2015. *Id.*

DBRE provides that farmers may elect its coverage only if they already have the "Common Crop Insurance Policy" and the "Dry Bean Crop Provisions" in force. DBRE at 1(b), ECF No. 50,

Ex. A. The Common Crop Insurance Policy permits farmers to elect either revenue protection or yield protection for certain crops, not including dry beans. CCIP 2010 Amendments at 1, ECF No. 50, Ex. B. "Revenue protection provides protection against loss of revenue caused by price changes or low yields or a combination of both." *Id.* "Yield protection provides protection for production losses only." *Id.* "For crops for which revenue protection is available, a projected price and a harvest price will be determined in accordance with the Commodity Exchange Price Provisions." *Id.* Yield protection guarantees are "determined by multiplying the production guarantee by the projected price." *Id.* Thus, for yield protection, the "harvest price is not used." *Id.* Revenue protection guarantees are "determined by multiplying the production guarantee by the greater of the guaranteed price or the harvest price." *Id.* "The projected price is used to determine the premium, and any replant payment or prevented planting payment. The harvest price is used to value the production to count." *Id.*

Under the Common Crop Insurance Policy and the Dry Bean Crop Provisions addendum, dry bean farmers do not have the option of obtaining revenue protection. Rather, they are limited to yield protection guarantees. DBRE, however, provides dry bean farmers access to revenue protection guarantees.

**i.**

DBRE offers two kinds of revenue protection: revenue protection without harvest price exclusion and revenue protection with harvest price exclusion. The coverage for both kinds of protection is calculated similarly. The first step is determining the projected price for dry beans. On or before February 15 of the crop year, the RMA must collect the "offer price and expected contract volume" from dry bean buyers for the various types of dry beans covered by the DRBE. DRBE § 7(e)(1)(A). After reviewing that information, the RMA will announce projected prices

for bean types "no later than the third business day of March." *Id.* at § (e)(1)(D). The projected price provides the baseline guarantee for purposes of revenue protection.

Not later than December 15 of the harvest year, the RMA must announce the "harvest price" for each type of bean. *Id.* at § (e)(2)(E). The harvest price is determined pursuant to the following procedure: "The market price of each type for each day of publication during the period beginning on the first business day in September and ending on the last business day of November will be collected." *Id.* at § (e)(2)(A). The "publication" mentioned in § (e)(2)(A) refers to the "Bean Market News, a publication of the Agricultural Marketing service, USDA," which publishes weekly market prices for specific types of dry beans in specific regions. § 2. Typically, the market price will be "the sum of the market prices for that type divided by the number of prices included in that sum." *Id.* at § (e)(2)(D). If the reported market price for a certain date is qualified by "terms that indicate a small volume of sales or no sales" occurred on that date, that market activity will be disregarded for purposes of calculating the market price. *Id.* at § (e)(2)(B). And, "if there is a market price for fewer than 50 percent of the dates of publication," no harvest price will be established. *Id.* at § (e)(2)(C).

The DBRE also provides contingencies for the event that either the projected price or harvest price cannot be calculated pursuant to the procedure provided above. Section 7(e)(3) indicates that, "[i]f a projected price for any of these types cannot be determined as described herein; . . . [t]he projected price will be determined by RMA and announced not later than the third business day of March; and . . . [t]he harvest price will equal the projected price." Section 3(c)(1) explains that if a projected price cannot be calculated for a type of dry bean, coverage for that type of bean will be subject to the terms of § 7(e)(3). Section 3(c)(2) provides that "[i]f the harvest price cannot be calculated for the crop year for a type for which a projected price was determined in

accordance with section 7 of this endorsement, the harvest price will be equal to the projected price." Confusingly, the Dry Bean Revenue Insurance Standards Handbook, which is a reference material for the DBRE, appears to identify a different contingency procedure for determining the harvest price when it cannot be calculated pursuant to section 7 of the DBRE. DBRE Handbook, ECF No. 50, Ex. D. In Section N, entitled "Inability to Determine a Harvest Price but a Projected Price was Established as Defined," the Handbook explains that "[i]f a harvest price cannot be determined . . . but a projected price was established . . . , RMA will establish the harvest price." *Id.* at 6.

Importantly, § 3(c) of the DBRE specifies that the contingencies for determining a projected and/or harvest price supersede "section 3(c)(5) of the Basic Provisions." Section 3(c)(5)(ii) of the Common Crop Insurance Policy, which DBRE thus supersedes, provides that when the harvest price cannot be calculated as provided by the provisions of the Common Policy, the harvest price will be determined and announced by the FCIC. Common Crop Insurance Policy § 3(c)(5)(ii), ECF No. 50, Ex. B.

**ii.**

The DBRE provides three examples which demonstrate how indemnity is calculated. First, if a farmer chooses yield protection but not revenue protection, the DRBE protections will not apply. In that scenario, the farmer obtains yield protection for a specific number of acres and a specific production guarantee per acre. *See* § 5 Example 1. In the example provided, the farmer insured 50 acres with a 1,600 lbs. per acre production guarantee, which totaled an 80,000 lbs. production guarantee. *Id.* That guarantee is multiplied by the projected price for the type of bean, and the resulting sum is the value of the guarantee (in the example, $22,400). If the farmer's actual yield is 25,000 lbs., that amount is multiplied by the projected price and then subtracted from the

total guarantee. The difference between the value of the total guarantee and the farmer's actual production (measured by reference to the projected price) is the farmer's indemnity.

The second example involves a farmer choosing revenue protection (meaning the DBRE terms apply) but not harvest price exclusion. In this scenario, the "revenue protection guarantee [is] calculated using the harvest price" if the harvest price is higher than the projected price. Otherwise, the farmer "must accept 100 percent of the projected price." *Id.* at Example 2. In other words, the production guarantee is multiplied by the harvest price (not the projected price) to create the revenue protection guarantee. Similarly, the farmer's actual production is multiplied by the harvest price and that sum is subtracted by the amount of the revenue protection guarantee. The difference is the farmer's indemnity. *See id.*

In the third example, the farmer chooses both revenue protection and a harvest price exclusion. This is a variation on DBRE coverage. When these coverage options are chosen, the "revenue protection guarantee is based on the projected price and the production to count is valued using the harvest price." *Id.* at Example 3. In other words, the revenue protection guarantee is calculated by multiplying the production guarantee by the projected price. The farmer's actual production is multiplied by the harvest price, and the value of the actual production is subtracted from the revenue protection guarantee. The remaining sum is the farmer's indemnity.

Thus, farmers who choose only yield protection do not receive additional indemnity if the market price is lower than the projected price. Farmers who choose revenue protection without the harvest price exclusion are guaranteed to receive full market-value compensation for their production guarantee and perhaps more, if the harvest price is lower than the projected price. Farmers who choose revenue protection with the harvest price exclusion are guaranteed to receive

the full projected price for their production guarantee, with the amount of indemnity decreasing if the harvest price exceeds the projected price.

Because they are receiving greater protection, farmers who choose revenue protection pay a higher premium than farmers who choose only yield protection. Second Am. Compl. at 20. Nevertheless, if the harvest price equals the projected price, farmers covered by both kinds of protection receive identical indemnification.

**B.**

Plaintiffs allege that, in 2015, "the Bean Market News did not publish market prices for navy and small red beans in Michigan or for dark red kidney beans in Minnesota and North Dakota for 50% or more of the publishing dates between September and November." *Id.* at 17. In fact, Plaintiffs further allege that only once in the preceding eight years had the Bean Market News published market prices for 50% or more of its publishing dates between September and November. *Id.* Accordingly, Plaintiffs contend that "it was not just foreseeable, but very likely, that the Bean Market News would not publish the specified number of market prices during the specified period in 2015." *Id.*

Plaintiffs argue that the "[a]ctual market prices" for navy, small red, and dark red kidney beans were contemporaneously available and remain available from the grain elevator processors which actually bought the insured beans from the Plaintiffs. *Id.* at 18. The actual market price showed "a great decline from the projected prices for the subject beans." *Id.* Because the Bean Market News had not published a sufficient number of market prices for the dates in question, "the RMA set the harvest prices . . . at an amount equal to the projected prices" on December 15, 2015. *Id.* at 19. Plaintiffs argue that this act "was contrary to law [and] contrary to the intent and purpose of the DBRE" because it "negated the revenue protection insurance provided by the DBRE [and]

. . . deprived Plaintiffs of the DBRE indemnity to which they are entitled." *Id.* Plaintiffs' alleged injury has been exacerbated because the Defendant insurers have "retained the additional premium paid by Plaintiffs for DBRE coverage" even though, in Plaintiffs' view, they did not actually receive revenue protection. *Id.*

## C.

On February 16, 2016, Plaintiff Greg Ackerman, the chair of the Michigan Bean Commission, and Carl Bednarski, President of the Michigan Farm Bureau, "sent a request to the FCIC's Board of Directors requesting that the harvest price be recalculated so that it reflected the actual market price." *Id.* (citing Feb. 16, 2016, Letter, ECF No. 72, Ex. E). That request was denied by the Chairman of the FCIC, Dr. Robert Johansson, on March 8, 2016. *Id.* (citing March 8, 2016, Denial, ECF No. 72, Ex. F). Ackerman subsequently requested "a determination from the RMA and the National Appeals Division (NAD) of the USDA that the March 8, 2016 letter of Dr. Johansson constituted a 'determination made by FCI that is a matter of general applicability [that] is not subject to administrative review.'" *Id.* (citing 7 C.F.R. 400.91(e)). The RMA "'decline[d] to render a determination of general applicability . . . because the RMA has not made any determinations in regard to your client's policy.'" *Id.* at 19–20. (quoting April 28, 2016, RMA Letter, ECF No. 72, Ex. G). On June 6, 2016, the NAD sent Ackerman a letter summarizing Ackerman's request and objections and concluding that "[t]he March 8, 2016, FCIC decision is not appealable because it establishes program eligibility requirements that are generally applicable to all participants." NAD Determination, ECF No. 72, Ex. H; Second Am. Compl. at 20.

Plaintiff's second amended complaint includes two counts. In the first count, Plaintiffs argue that Defendants' interpretation of the DBRE was arbitrary and capricious.

> [T]he administrative determinations of the FCIC and RMA of December 15, 2015 and March 8, 2016 interpreting the DBRE to require the harvest price to be set equal

to the projected price . . . were arbitrary, capricious, an abuse of discretion, and not in accordance with law; were contrary to statutes and other law; were without observance of procedure required by law; and were unwarranted by the facts.

Second Am. Compl. at 20.

In the second count, Plaintiffs contend that Defendants should not have approved the DBRE in 2012 and 2013 because

> the DBRE lacks an essential contract provision such that the purpose of the contract and the intent of the parties are subverted by its absence. To wit, the DBRE omits the procedure to be followed "in the case that…a harvest price cannot be determined in the manner described [in the DBRE]." DBRE 7(d). The parties to the [DBRE] contract intended that the harvest price be set by the RMA based on actual market prices in the event that the harvest price could not be determined in the manner described in the DBRE.

*Id.* at 21. Plaintiffs further allege that "the RMA and FCIC are required by 7 U.S.C. § 1508(c)(5) to set harvest prices that reflect actual market prices." *Id.* Plaintiffs allege that

> either the Plaintiffs and the insurance companies both believed and relied on the RMA and FCIC's averment that the DBRE in fact provided revenue protection insurance coverage to Plaintiffs, or, Plaintiffs unilaterally believed that the DBRE provided such coverage and acted in reliance on that belief, while the insurers knew that it did not, but accepted payment of DBRE premiums by Plaintiffs knowing, there was no DBRE coverage.

*Id.* at 22. For that reason, they believe that "[t]his mutual mistake or unilateral mistake with fraud necessitates reformation of the DBRE to reflect the intent of the parties at the time of contracting." *Id.*

## II.

Plaintiffs have now filed a motion for supplementation of the administrative record. ECF Nos. 86, 87. They request that the following material be added to the record:

1. 2015 sales records from every Michigan dry bean processor on which Defendants relied, or on which they purported to rely.

2. Any and all communications between Defendants and dry bean processors from September 1, 2015 through December 15, 2015.

3. Any notes or other records possessed by Jonathan Gittlein on which Defendants relied in determining market prices to be published or not, in the Dry Bean Market News.

ECF No. 87 at 1. Plaintiffs further request that additional discovery be permitted to supplement the record with the following:

4. As an alternative to 1, above, if the sales records are not in the possession of Defendants, Plaintiffs request leave of the Court to subpoena 2015 sales records of the dry bean processors on which Defendants should have relied to establish the harvest prices in 2015…

5. Plaintiffs also request leave of the Court to serve Requests to Admit on Defendants regarding the Bean Market News and the decision-making process which led to the non-publication of market prices for beans at issue during the relevant time period.

6. As an alternative or supplement to 5, above, Plaintiffs request leave to depose Jonathan Gittlein, of Greeley, Colorado, an employee of Defendant United States Department of Agriculture (USDA) tasked with compiling the Bean Market News, on which the harvest price in this matter is based.

7. Plaintiffs also request leave to depose Alex Offerdahl of Watts & Associates, who was instrumental in drafting, proposing, and maintaining the Dry Bean Revenue Endorsement.

*Id.* at 2.

### III.

Judicial review of an administrative decision is typically constrained to the administrative record. "De novo review is generally not appropriate…[T]he focal point [for judicial review] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142–143 (1973). This is to ensure that the reviewing court does not use other evidence to "convert the 'arbitrary and capricious' standard into effectively *de novo* review." *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000).

However, the court may supplement the administrative record "when an agency has deliberately or negligently excluded certain documents from the record, or when a court needs

certain 'background' information to determine whether the agency has considered all relevant factors." *Latin Ams. for Soc. & Econ. Dev.*, 756 F. 3d 447, 464–65 (6th Cir. 2014) (citing *Sierra Club v. Slater*, 120 F. 3d 623, 638 (6th Cir. 1997)). The burden is upon plaintiff to justify supplementation of the record. *Id.*

## IV.

The administrative record will not be supplemented for the reasons stated below.

### A.

Plaintiffs request that the Court supplement the administrative record with "2015 sales records from every Michigan dry bean processor on which Defendants relied, or on which they purported to rely." ECF No. 87 at 1. If Defendants do not possess this information, Plaintiffs ask the Court to permit them to subpoena "2015 sales records of the dry bean processor on which Defendants should have relied to establish the harvest prices in 2015." *Id.* at 2.

Plaintiffs contend that these records are necessary for the Court in reviewing Defendants' actions because

> The Federal Crop Insurance Act (FCIA) (7 U.S.C. § 1501, et seq.) and the Dry Bean Revenue Insurance Standards Handbook (RISH) required the RMA to establish a harvest price that reflected the actual market price in the event that BMN [sic] price reporting system failed…In order to do so, it could have and should have used the actual market prices. Those records were available at the time, and they remain available now.

*Id.* at 7. Plaintiffs also argue that "documentary evidence that the market prices did indeed drop is necessary, as well as proof that those records were available to guide Defendants in making their decision." ECF No. 90 at 3.

This information would not assist the Court in deciding the two counts presented in Plaintiffs' second amended complaint. The first count contends that Defendants' interpretation of the DBRE was erroneous and the second count contends that Defendants should not have approved

- 12 -

the DBRE in the first instance. Plaintiffs do not explain how a record of the actual market prices would assist the Court in determining either of these counts.

**i.**

The first count's primary issue is whether when determining the harvest price, Defendants should have used the actual market prices rather than the projected price. Knowing the actual market prices does not change the inquiry because the issue is solely whether Defendants should have used the actual market prices or the projected price. If the Court were to decide that Defendants should have used the actual market prices, a record of the 2015 dry bean sales would be necessary to determine at what level the harvest price should have been set. However, the Court has yet to determine whether Defendants should have used the actual market prices at all. Accordingly, the request is as least premature.

It could be argued that the 2015 sales records should be added to the record in case they are needed at a later stage in the litigation. However, as explained above, the focus of judicial review of an agency's actions must be the administrative record. The record can only be supplemented if Plaintiffs demonstrate that the Defendants deliberately or negligently excluded documents from the record or that the additional records are necessary for the Court to make a determination. *Latin Ams. for Soc. & Econ. Dev.*, 756 F. 3d 447, 464–65 (6th Cir. 2014). Plaintiffs have made no showing that Defendants deliberately or negligently excluded information from the their decision making nor have they demonstrated that the 2015 sales records are necessary for the Court to reach a determination concerning Defendants' interpretation of the DBRE.

**ii.**

Plaintiff's second count contends that Defendants' decision to approve the DBRE in 2012 and 2013 was arbitrary and capricious. However, there is no reason why 2015 sales records are

necessary to determine the appropriateness of a decision from 2012 and 2013. The 2015 records did not exist when Defendants approved the DBRE. The 2015 records might affect the consequences of Defendants' actions, but they do not address whether Defendants were arbitrary and capricious when they approved the DBRE back in 2012 and 2013.

**B.**

Plaintiffs next request that the Court supplement the administrative record with "any and all communications between Defendants and dry bean processors from September 1, 2015 through December 15, 2015." ECF No. 87 at 1. Plaintiffs do not explain why they or the Court must be apprised of communications between Defendants and dry bean processors in order to make a determination on Plaintiffs' claims. Plaintiffs explain the importance of the Bean Market News in the determination of the harvest price and cite experts who expressed concerns about the viability of using the Bean Market News in this way. However, Plaintiffs do not specify how communications between Defendants and processors relate to this assertion. Presumably, the communications would include information that Defendants used (or should have used) in publishing the Bean Market News.

Plaintiffs also seek leave to obtain information "regarding the Bean Market News and the decision-making process which led to the non-publication of market prices for beans at issue during the relevant time period." ECF No. 87 at 2. Additionally, Plaintiffs request leave to depose Jonathan Gittlein and to receive "[a]ny notes or other records possessed by Jonathan Gittlein on which Defendants relied in determining market prices to be published or not, in the Dry Bean Market News." *Id.* at 1–2. During 2015, Gittlein was responsible for obtaining prices for dry beans by calling local grain elevators. ECF No. 60 at 7.

**i.**

In Count I of their complaint, Plaintiffs allege that it was arbitrary and capricious for Defendants in 2015 to set the harvest price to the projected price rather than the actual market price. However, as explained above, this claim is wholly concerned with Defendants' interpretation of the DBRE. Defendants determined that as stated in Section 3(c)(2) of the DBRE, the harvest price should be set to the projected price if the Bean Market News was not published weekly more than 50% of the time between September and November. From September 2015 to November 2015, the Bean Market News was published less than 50% of the required time. Accordingly, Defendants set the harvest price to the projected price.

Plaintiffs have alleged that the Bean Market News's collection of the data in 2015 was sporadic at best, but Plaintiffs do not explain if or how this influenced Defendants' interpretation of the DBRE. Plaintiffs' complaint does not ascribe any misconduct by the Bean Market News in relation to Defendants' interpretation of the DBRE. Rather, the complaint states that

> the applicable insurance policy (including the DBRE, the Common Crop Insurance Policy, and the Dry Bean Crop Provisions); the Dry Bean Revenue Insurance Standards Handbook; 7 U.S.C. §1508; the common law; and basic principles of equity all dictate that the harvest price be calculated by the RMA based on actual market prices.

ECF No. 72 at 20. The claim is wholly concerned with the interpretation of the DBRE itself and the associated law. It makes no mention of the Bean Market News or any type of negligence or misconduct that influenced Defendants' interpretation of the DBRE. Thus, there is no reason to supplement the administrative record with additional information concerning the Bean Market News from 2015.

**ii.**

In Count II, Plaintiffs contend that Defendants were arbitrary and capricious in approving the DBRE in 2012 and 2013. As argued by Plaintiffs, it may have been arbitrary and capricious for Defendants to approve the DBRE with provisions that determined the harvest price solely upon

- 15 -

the Bean Market News. From 2007 to 2011 (the four years preceding Defendants' approval of the DBRE), the Bean Market News had published the minimum number of prices only once. ECF No. 72 at 4. If Defendants knew about the Bean Market News's infrequency, it may have been inappropriate for them to have approved the DBRE since the past publications of the Bean Market News indicated that insufficient data would be published.

However, Plaintiffs have not demonstrated how communications related to the 2015 Bean Market News are relevant. Defendants had already approved the DBRE years prior to any communications about the 2015 Bean Market News. Only those actions of the Bean Market News prior to Defendants' 2012 and 2013 approval of the DBRE are relevant to determining whether Defendants were arbitrary and capricious in their decision to approve the DBRE in 2012 and 2013.

Plaintiffs further argue that the administrative record lacks documentation concerning how the Bean Market News functioned and the extent of Defendants' oversight. In their motion to supplement the record, Plaintiffs argue that

> The administrative record contains no details as to either how the BMN worked or whether the Risk Management Agency (RMA) took any remedial steps to verify the accuracy of publication of dry bean market prices by the BMN. This information is crucial to the Court's APA review yet virtually no documents were produced by Defendants that pertain to the BMN.

ECF No. 87-1 at 6. This type of information may be relevant to the Court's determination as to whether Defendants approval of the DBRE in 2012 and 2013 was arbitrary and capricious. However, Plaintiffs have not indicated how communications between Defendants and processors from September 2015 to November 2015 would provide this information, nor how Gittlein, an employee in 2015, would provide this information.

Accordingly, it is unnecessary at least at this stage in the development of the case to supplement the administrative record with the requested material.

## C.

Lastly, Plaintiffs request leave to depose Alex Offerdahl of Watts and Associates, "who was instrumental in drafting, proposing, and maintaining the Dry Bean Revenue Endorsement." ECF No. 87 at 2. Plaintiffs argue that Offerdahl "designed, marketed, and maintained the DBRE…[and] may be able to provide helpful explanation of his presentations and other information provided regarding how the DBRE harvest price system was supposed to work." *Id.* Plaintiffs allege that the RMA board may have not reviewed the BMN historical data nor consulted the expert reviewers' recommendation of the DBRE. *Id.* Plaintiffs contend that Offerdahl "may be able to shed light on this question." *Id.*

Plaintiffs' request will be denied. Defendants identify multiple documents within the administrative record showing that "[d]uring the approval process, the RMA expressed concerns regarding the use of third party pricing." ECF No. 89 at 8 (citing Admin. Rec., Dkt. 83-4, PgID 3421, FCIC00001485; Admin. Rec., Dkt. 83-4, PgID 3398, FCIC0001462; Admin. Rec., Dkt. 83-4, PgID 3408, FCIC0001472). These documents address the issue of whether the RMA Board was aware of concerns about setting the harvest price according to the Bean Market News. Offerdahl's testimony would contribute little to what is already present in the administrative record on this topic.

**V.**

Accordingly, it is **ORDERED** that Plaintiffs' motions to complete and/or supplement the administrative record, ECF Nos. 86 and 87, are **DENIED without prejudice**.

Dated: December 21, 2018  s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge