UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ACKERMAN BROTHERS FARMS, LLC, et al.,

             Plaintiffs,                    Case No. 17-cv-11779

v.                                    Honorable Thomas L. Ludington

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al.,

             Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, AND DISMISSING
THE SECOND AMENDED COMPLAINT**

On June 5, 2017, a group of farmers and incorporated farms filed suit against a number of

insurance companies, the United States Department of Agriculture, the Risk Management Agency,

and the Federal Crop Insurance Corporation. ECF No. 1. The Plaintiffs were dry bean farmers in

Michigan, Minnesota, and North Dakota who have not received indemnity for crop insurance to

which they believe they are entitled. Defendant United States Department of Agriculture

("USDA") "is a department of the United States Government and is the parent agency of Defendant

[Risk Management Agency ("RMA")], which in turn administers Defendant [Federal Crop

Insurance Corporation ("FCIC")], a wholly government-owned corporation created under the

Federal Crop Insurance Act, 7 U.S.C. §1501, et seq." *Id.* at 14. The Insurance Defendants sold

insurance coverage to Plaintiffs during 2015.

On November 22, 2017, the Federal Defendants and Insurance Defendants both filed

motions to dismiss. ECF Nos. 51, 52. On March 8, 2018, Plaintiffs filed a motion for leave to file

a second amended complaint correcting the names of certain Plaintiffs. ECF No. 64. On April 18,

2018, the Court issued an order granting the motions to dismiss and also granting the motion for leave to file an amended complaint. ECF No. 70. The Court concluded that Plaintiffs had not complied with the insurance policies' arbitration requirements. Accordingly, all Insurance Defendants were dismissed. The Court also dismissed without prejudice all Plaintiffs who did not farm or reside in the Eastern District of Michigan, concluding that they were bringing suit in the improper venue. On April 30, 2018, Plaintiffs filed a second amended complaint. ECF No. 72.

On May 2, 2018, Plaintiffs filed a motion for reconsideration of the Court's order to dismiss. ECF No. 74. In the motion, Plaintiffs argued that the plaintiffs from outside the Eastern District of Michigan should have been transferred to the proper venue instead of dismissed. The motion was granted in part and the Minnesota Plaintiffs were transferred to the District of Minnesota. ECF No. 80.

On October 31, 2018, Plaintiffs filed a motion for supplementation of the administrative record. ECF Nos. 86, 87. Plaintiffs contended that information was excluded from the Administrative Record that was necessary for the Court to determine whether Defendants acted arbitrarily and capriciously. *Id.* The Court determined that the Administrative Record adequately addressed the matters in question and the motion was denied. ECF No. 91.

On April 1, 2019, both Plaintiffs and Defendants filed cross-motions for summary judgment. ECF Nos. 96, 97. Plaintiffs later filed a motion for class certification. ECF No. 103. For the following reasons, Plaintiffs' motion for summary judgment will be denied, Defendants' motion for summary judgment will be granted, and Plaintiffs' motion for class certification will be denied as moot.

# I.

Plaintiffs are bringing this putative class action "on behalf of all dry bean farmers in the Eastern District of Michigan (navy [pea] beans or small red beans)." Second Am. Compl. at 2, ECF No. 72. Each Plaintiff purchased Dry Bean Revenue Endorsement ("DRBE") crop insurance for their dry bean crops in 2015. *Id.* "The purpose of this insurance was to protect dry bean farmers against a market price decline." *Id.* However, Plaintiffs allege that though "dry bean market prices declined greatly in 2015, no indemnity was paid to Plaintiffs." *Id.* In the present suit, Plaintiffs seek a declaratory judgment invalidating certain administrative determinations related to the Dry Bean Revenue Endorsement ("DBRE") and ordering Defendants to ensure that Plaintiffs' losses are indemnified or their premiums reimbursed. *Id.* at 2–3.

## A.

Congress passed the Federal Crop Insurance Act in 1938 in order to "promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." 7 U.S.C. §1502(a). The act includes a provision permitting the Federal Crop Insurance Corporation to conduct pilot programs for proposed crop insurance. 7 U.S.C. §1523(a)(1). Those proposed programs must be submitted to FCIC Board. The Board then evaluates "whether a proposal or new risk management tool tested by the pilot program is suitable for the marketplace and addresses the needs of producers of agricultural commodities." 7 U.S.C. §1523(a)(1).

The current dispute arises out of a pilot program developed by Watts and Associates ("Watts"), a "privately owned economic consulting firm located in Billings, Montana." Second Am. Compl. at 15. FCIC Board approved the program, titled Dry Bean Revenue Endorsement, in

2012 for dry bean crops in Minnesota and North Dakota. *Id.* The pilot program became effective in 2013. *Id.* After initial success, FCIC approved an expansion of the pilot program to include farmers in Michigan, effective in 2014. *Id.* Pursuant to that expansion, Michigan dry bean farmers "purchased 1,286 DBRE policies, covering 151,464 acres" in 2015. *Id.*

The DBRE provides that farmers may elect its coverage only if they already have the "Common Crop Insurance Policy" and the "Dry Bean Crop Provisions" in force. DBRE at 1(b), ECF No. 50, Ex. A. The Common Crop Insurance Policy permits farmers to elect either revenue protection or yield protection for certain crops, not including dry beans. CCIP 2010 Amendments at 1, ECF No. 50, Ex. B. "Revenue protection provides protection against loss of revenue caused by price changes or low yields or a combination of both." *Id.* "Yield protection provides protection for production losses only." *Id.* "For crops for which revenue protection is available, a projected price and a harvest price will be determined in accordance with the Commodity Exchange Price Provisions." *Id.* Yield protection guarantees are "determined by multiplying the production guarantee by the projected price." *Id.* Thus, for yield protection, the "harvest price is not used." *Id.* Revenue protection guarantees are "determined by multiplying the production guarantee by the greater of the guaranteed price or the harvest price." *Id.* "The projected price is used to determine the premium, and any replant payment or prevented planting payment. The harvest price is used to value the production to count." *Id.*

Under the Common Crop Insurance Policy and the Dry Bean Crop Provisions addendum, dry bean farmers do not have the option of obtaining revenue protection. Rather, they are limited to yield protection guarantees. DBRE, however, provides dry bean farmers access to revenue protection guarantees.

**1.**

DBRE offers two kinds of revenue protection: revenue protection without harvest price exclusion and revenue protection with harvest price exclusion. The coverage for both kinds of protection is calculated similarly. The first step is determining the projected price for dry beans. On or before February 15 of the crop year, the RMA must collect the "offer price and expected contract volume" from dry bean buyers for the various types of dry beans covered by the DBRE. DBRE §7(e)(1)(A). After reviewing that information, the RMA will announce projected prices for bean types "no later than the third business day of March." *Id.* at §(e)(1)(D). The projected price provides the baseline guarantee for purposes of revenue protection.

Not later than December 15 of the harvest year, the RMA must announce the "harvest price" for each type of bean. *Id.* at §(e)(2)(E). The harvest price is determined pursuant to the following procedure: "The market price of each type for each day of publication during the period beginning on the first business day in September and ending on the last business day of November will be collected." *Id.* at §(e)(2)(A). The "publication" mentioned in §(e)(2)(A) refers to the "Bean Market News, a publication of the Agricultural Marketing service, USDA," which publishes weekly market prices for specific types of dry beans in specific regions. §2. Typically, the market price will be "the sum of the market prices for that type divided by the number of prices included in that sum." *Id.* at §(e)(2)(D). If the reported market price for a certain date is qualified by "terms that indicate a small volume of sales or no sales" occurred on that date, that market activity will be disregarded for purposes of calculating the market price. *Id.* at §(e)(2)(B). And, "if there is a market price for fewer than 50 percent of the dates of publication," no harvest price will be established. *Id.* at §(e)(2)(C).

The DBRE also provides contingencies for the event that either the projected price or harvest price cannot be calculated pursuant to the procedure provided above. Section 7(e)(3)

indicates that, "[i]f a projected price for any of these types cannot be determined as described herein; . . . [t]he projected price will be determined by RMA and announced not later than the third business day of March; and . . . [t]he harvest price will equal the projected price." Section 3(c)(1) explains that if a projected price cannot be calculated for a type of dry bean, coverage for that type of bean will be subject to the terms of §7(e)(3). Section 3(c)(2) provides that "[i]f the harvest price cannot be calculated for the crop year for a type for which a projected price was determined in accordance with section 7 of this endorsement, the harvest price will be equal to the projected price."

Confusingly, the Dry Bean Revenue Insurance Standards Handbook, which is a reference material for the DBRE, appears to identify a different contingency procedure for determining the harvest price when it cannot be calculated pursuant to section 7 of the DBRE. DBRE Handbook, ECF No. 50, Ex. D. In Section N, entitled "Inability to Determine a Harvest Price but a Projected Price was Established as Defined," the Handbook explains that "[i]f a harvest price cannot be determined . . . but a projected price was established . . . , RMA will establish the harvest price." *Id.* at 6.

Importantly, §3(c) of the DBRE specifies that the contingencies for determining a projected and/or harvest price supersede "section 3(c)(5) of the Basic Provisions." Section 3(c)(5)(ii) of the Common Crop Insurance Policy, which the DBRE thus supersedes, provides that when the harvest price cannot be calculated as provided by the provisions of the Common Policy, the harvest price will be determined and announced by FCIC. Common Crop Insurance Policy §3(c)(5)(ii), ECF No. 50, Ex. B.

**2.**

The DBRE provides three examples which demonstrate how indemnity is calculated. First, if a farmer chooses yield protection but not revenue protection, the DRBE protections will not apply. In that scenario, the farmer obtains yield protection for a specific number of acres and a specific production guarantee per acre. *See* §5 Example 1. In the example provided, the farmer insured 50 acres with a 1,600 lbs. per acre production guarantee, which totaled an 80,000 lbs. production guarantee. *Id.* That guarantee is multiplied by the projected price for the type of bean, and the resulting sum is the value of the guarantee (in the example, $22,400). If the farmer's actual yield is 25,000 lbs., that amount is multiplied by the projected price and then subtracted from the total guarantee. The difference between the value of the total guarantee and the farmer's actual production (measured by reference to the projected price) is the farmer's indemnity.

The second example involves a farmer choosing revenue protection (meaning the DBRE terms apply) but not harvest price exclusion. In this scenario, the "revenue protection guarantee [is] calculated using the harvest price" if the harvest price is higher than the projected price. Otherwise, the farmer "must accept 100 percent of the projected price." *Id.* at Example 2. In other words, the production guarantee is multiplied by the harvest price (not the projected price) to create the revenue protection guarantee. Similarly, the farmer's actual production is multiplied by the harvest price and that sum is subtracted by the amount of the revenue protection guarantee. The difference is the farmer's indemnity. *See id.*

In the third example, the farmer chooses both revenue protection and a harvest price exclusion. This is a variation on DBRE coverage. When these coverage options are chosen, the "revenue protection guarantee is based on the projected price and the production to count is valued using the harvest price." *Id.* at Example 3. In other words, the revenue protection guarantee is calculated by multiplying the production guarantee by the projected price. The farmer's actual

production is multiplied by the harvest price, and the value of the actual production is subtracted from the revenue protection guarantee. The remaining sum is the farmer's indemnity.

Thus, farmers who choose only yield protection do not receive additional indemnity if the market price is lower than the projected price. Farmers who choose revenue protection without the harvest price exclusion are guaranteed to receive full market-value compensation for their production guarantee and perhaps more, if the harvest price is lower than the projected price. Farmers who choose revenue protection with the harvest price exclusion are guaranteed to receive the full projected price for their production guarantee, with the amount of indemnity decreasing if the harvest price exceeds the projected price.

Because they are receiving greater protection, farmers who choose revenue protection pay a higher premium than farmers who choose only yield protection. Second Am. Compl. at 20. Nevertheless, if the harvest price equals the projected price, farmers covered by both kinds of protection receive identical indemnification.

**B.**

Plaintiffs allege that, in 2015, "the Bean Market News did not publish market prices for navy and small red beans in Michigan or for dark red kidney beans in Minnesota and North Dakota for 50% or more of the publishing dates between September and November." *Id.* at 17. In fact, Plaintiffs further allege that only once in the preceding eight years had the Bean Market News published market prices for 50% or more of its publishing dates between September and November. *Id.* Accordingly, Plaintiffs contend that "it was not just foreseeable, but very likely, that the Bean Market News would not publish the specified number of market prices during the specified period in 2015." *Id.*

Plaintiffs argue that the "[a]ctual market prices" for navy, small red, and dark red kidney beans were contemporaneously available and remain available from the grain elevator processors which actually bought the insured beans from the Plaintiffs. *Id.* at 18. The actual market price showed "a great decline from the projected prices for the subject beans." *Id.* Because the Bean Market News had not published a sufficient number of market prices for the dates in question, "the RMA set the harvest prices . . . at an amount equal to the projected prices" on December 15, 2015. *Id.* at 19. Plaintiffs argue that this act "was contrary to law [and] contrary to the intent and purpose of the DBRE" because it "negated the revenue protection insurance provided by the DBRE [and] . . . deprived Plaintiffs of the DBRE indemnity to which they are entitled." *Id.* Plaintiffs' alleged injury has been exacerbated because the Defendant insurers have "retained the additional premium paid by Plaintiffs for DBRE coverage" even though, in Plaintiffs' view, they did not actually receive revenue protection. *Id.*

## C.

On February 16, 2016, Plaintiff Greg Ackerman, the chair of the Michigan Bean Commission, and Carl Bednarski, President of the Michigan Farm Bureau, "sent a request to FCIC's Board of Directors requesting that the harvest price be recalculated so that it reflected the actual market price." *Id.* (citing Feb. 16, 2016, Letter, ECF No. 72, Ex. E). That request was denied by the Chairman of FCIC, Dr. Robert Johansson, on March 8, 2016. *Id.* (citing March 8, 2016, Denial, ECF No. 72, Ex. F). Ackerman subsequently requested "a determination from the RMA and the National Appeals Division (NAD) of the USDA that the March 8, 2016 letter of Dr. Johansson constituted a 'determination made by FCIC that is a matter of general applicability [that] is not subject to administrative review.'" *Id.* (citing 7 C.F.R. 400.91(e)). The RMA "'decline[d] to render a determination of general applicability . . . because the RMA has not made any

determinations in regard to your client's policy.'" *Id.* at 19–20. (quoting April 28, 2016, RMA Letter, ECF No. 72, Ex. G). On June 6, 2016, the NAD sent Ackerman a letter summarizing Ackerman's request and objections and concluding that "[t]he March 8, 2016, FCIC decision is not appealable because it establishes program eligibility requirements that are generally applicable to all participants." NAD Determination, ECF No. 72, Ex. H; Second Am. Compl. at 20.

Plaintiff's second amended complaint includes two counts. In the first count, Plaintiffs argue that Defendants' interpretation of the DBRE was arbitrary and capricious.

> [T]he administrative determinations of FCIC and RMA of December 15, 2015 and March 8, 2016 interpreting the DBRE to require the harvest price to be set equal to the projected price . . . were arbitrary, capricious, an abuse of discretion, and not in accordance with law; were contrary to statutes and other law; were without observance of procedure required by law; and were unwarranted by the facts.

Second Am. Compl. at 20.

In the second count, Plaintiffs contend that Defendants should not have approved the DBRE in 2012 and 2013 because

> the DBRE lacks an essential contract provision such that the purpose of the contract and the intent of the parties are subverted by its absence. To wit, the DBRE omits the procedure to be followed "in the case that…a harvest price cannot be determined in the manner described [in the DBRE]." DBRE 7(d). The parties to the [DBRE] contract intended that the harvest price be set by the RMA based on actual market prices in the event that the harvest price could not be determined in the manner described in the DBRE.

*Id.* at 21. Plaintiffs further allege that "the RMA and FCIC are required by 7 U.S.C. §1508(c)(5) to set harvest prices that reflect actual market prices." *Id.* Plaintiffs allege that

> either the Plaintiffs and the insurance companies both believed and relied on the RMA and FCIC's averment that the DBRE in fact provided revenue protection insurance coverage to Plaintiffs, or, Plaintiffs unilaterally believed that the DBRE provided such coverage and acted in reliance on that belief, while the insurers knew that it did not, but accepted payment of DBRE premiums by Plaintiffs knowing, there was no DBRE coverage.

*Id.* at 22. For that reason, they believe that "[t]his mutual mistake or unilateral mistake with fraud necessitates reformation of the DBRE to reflect the intent of the parties at the time of contracting." *Id.*

## II.

Under the APA, a court must set aside an agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §706(2)(A). To determine whether an agency has acted arbitrarily or capriciously, a court should consider whether:

> The agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658, (2007). However, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, (1983). "The arbitrary and capricious standard is the least demanding review of an administrative action. If there is any evidence to support the agency's decision, the agency's determination is not arbitrary and capricious." *Kroger Co. v. Reg'l Airport Auth. of Louisville and Jefferson*, 286 F.3d 382, 389 (6th Cir. 2002) (internal citations omitted).

Judicial review is generally limited to the administrative record that was before the agency at the time of its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410-20 (1971). Based on the record before it, an agency is required to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, (internal quotation omitted). Therefore, a party challenging an agency action is required to "show that the action had no rational basis or that it involved a clear

and prejudicial violation of the applicable statutes or regulations." *McDonald Welding v. Webb*, 829 F.2d 593, 595 (6th Cir.1987). A court must give an agency's interpretation of its own regulations "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512, (1994) (internal quotations omitted).

## III.

In the first count of their amended complaint, Plaintiffs argue that Defendants' interpretation of the DBRE was arbitrary and capricious.

> [T]he administrative determinations of FCIC and RMA of December 15, 2015 and March 8, 2016 interpreting the DBRE to require the harvest price to be set equal to the projected price . . . were arbitrary, capricious, an abuse of discretion, and not in accordance with law; were contrary to statutes and other law; were without observance of procedure required by law; and were unwarranted by the facts.

ECF No. 72 at PageID.1657.

## A.

Plaintiffs contend that the Federal Crop Insurance Act requires the RMA to set the harvest price to the market price rather than the projected price. 7 U.S.C. §1508(c)(5) provides

> **(A) Establishment or approval**
> For the purposes of this subchapter, the Corporation [FCIC] shall establish or approve the price level (referred to in this subchapter as the "expected market price") of each agricultural commodity for which insurance is offered.

> **(B) General rule**
> Except as otherwise provided in subparagraph (C), the expected market price of an agricultural commodity shall be not less than the projected market price of the agricultural commodity, as determined by the Corporation.

An insurance policy could be structured differently from the general rule in §(c)(5)(B) if it is one of the four "[o]ther authorized approaches" found in §(c)(5)(C) which provides

> **(C) Other authorized approaches**
> The expected market price of an agricultural commodity--

**(i)** may be based on the actual market price of the agricultural commodity at the time of harvest, as determined by the Corporation;

**(ii)** in the case of revenue and other similar plans of insurance, may be the actual market price of the agricultural commodity, as determined by the Corporation;

**(iii)** in the case of cost of production or similar plans of insurance, shall be the projected cost of producing the agricultural commodity, as determined by the Corporation; or

**(iv)** in the case of other plans of insurance, may be an appropriate amount, as determined by the Corporation.

7 U.S.C. §1508(c)(5). Plaintiffs reason that

> Standing on its own, §(c)(5) appears to **require** that the expected market price of an agricultural commodity be based on the actual market price or actually be the actual market price of the agricultural commodity. The inclusion of the word "or" before the last subject in the list found at (c)(5)(C)(i) through (iv) suggests that one of these definitions of "expected market price" must be chosen. Here, the only two that make sense in this context are (i) or (ii).

ECF No. 97-2 at PageID.17700 (emphasis in original).

Plaintiffs' contention is belied by subparagraph (iii) which uses the term "shall" rather than "may." This indicates that in cases of "cost of production or similar plans of insurance," the relevant policies are required to be "the projected cost of producing the agricultural commodity, as determined by the Corporation." 7 U.S.C. §1508(c)(5)(C)(iii). By contrast, the other three subsections all use the term "may," indicating that these pricing schemes are optional. Congress could have used the word "shall" in subparagraphs (i), (ii), and (iv) as it did in subparagraph (iii). However, it did not do so. Accordingly, it will not be presumed that Congress intended to constrain FCIC to adopt only one of the four options presented in the statute. This is further supported by the fact that nowhere in the statute does it state that §(c)(5)(C) was intended to list the exclusive pricing methods.

7 U.S.C. §1508(h) also supports the contention that the Federal Crop Insurance Act does not require FCIC to set the harvest price for insurance policies. It provides

> (1) Authority to submit
>
>> (A) In general
>> In addition to any standard forms or policies that the Board may require be made available to producers under subsection (c), a person (including an approved insurance provider, a college or university, a cooperative or trade association, or any other person) may prepare for submission or propose to the Board--
>>
>>> (i) other crop insurance policies and provisions of policies; and
>>>
>>> (ii) rates of premiums for multiple peril crop insurance pertaining to wheat, soybeans, field corn, and any other crops determined by the Secretary.

7 U.S.C. §1508(h)(1). The DBRE originates from this provision, as it was proposed by Watts and not FCIC. More importantly, the statute explicitly authorizes the applicant to adopt a pricing practice different from those listed in other provisions of the Federal Crop Insurance Act. 7 U.S.C. §1508(h)(2) provides

> A policy or other material submitted to the Board under this subsection *may be prepared without regard to the limitations contained in this subchapter*, including the requirements concerning the levels of coverage and rates and the requirement that a price level for each commodity insured must equal the expected market price for the commodity as established by the Board.

7 U.S.C. §1508(h)(2) (emphasis added). This provision authorizes FCIC to utilize other pricing requirements in the Federal Crop Insurance Act. Even if the DBRE was not in compliance with the general rule of §1508(c)(5), it is permitted to depart from this rule by §1508(h)(1).

**B.**

Plaintiffs argue that the RMA had the authority to set the harvest price to the market price rather than the projected price. Defendants argue that instead, this authority lies with Watts.

**1.**

Under 7 C.F.R. §400.709(a)(1)(i), it is the applicant's responsibility to "provide premium rates and prices by the deadlines set by RMA." ECF No. 96 at PageID.17659. 7 C.F.R. §400.709 defines an "applicant" as "[a]ny person or entity that submits to the Board for approval a 508(h) submission under section 508(h) of the Act." 7 C.F.R. §400.701. Watts was an applicant pursuant to this section because it submitted a proposal to Defendants under section 508(h).

Section 709(a)(1)(i) outlines the responsibilities of the applicant. It provides:

(a) With respect to the applicant:

    (1) The applicant is responsible for:

        (i) Preparing and ensuring that all policy documents, rates of premium, prices, and supporting materials, including actuarial documents, are submitted by the deadline specified by FCIC, in the form approved by the Board, and are in compliance with section 508 of the Rehabilitation Act;

7 C.F.R. §400.709(a)(1)(i). Additionally, "[o]nly the applicant may make changes to the policy, plan of insurance, or rates of premium approved by the Board." 7 C.F.R. §400.709(a)(2). The changes are only implemented after the Board approves them. *Id.*

The applicant is solely responsible for any errors in the policy. Pursuant to 7 C.F.R. §400.709(a)(3), "the applicant is solely liable for any mistakes, errors, or flaws in the submitted policy, plan of insurance, their related materials, or the rates of premium that have been approved by the Board…" Accordingly, Defendants contend that they cannot be held liable for Plaintiffs' injuries because the mistake identified by Plaintiffs (setting the reimbursement to the projected price rather than the market price) was Watts's decision and not the Defendants.

Plaintiffs contend that Defendants' argument is belied by Defendants' own correspondence. Plaintiffs identify two documents that they claim support this assertion. The first is an Informational Memorandum from Tim B. Witt, Deputy Administrator with the USDA

containing harvest prices for crops with a March 15, 2015 sales closing date. ECF No. 102-2 at PageID.17824. Plaintiffs argue that "Defendants set the harvest price themselves with their informational memorandum of December 15, 2015." ECF No. 102 at PageID.17809. However, the memorandum explains that the harvest prices were set in accordance with the DBRE. ECF No. 102-2 at PageID.17824. ("In accordance with section 3(c)(2) of the Dry Bean Revenue Endorsement and section 3(d)(2) of the Dry Pea Revenue Endorsement, the harvest price will be equal to the projected price when a harvest price cannot be determined."). Accordingly, the Defendants were simply implementing the harvest price as directed by the DBRE. There is no indication that Defendants exercised any form of discretion in setting the harvest price. They followed the federal regulation by acting in accordance with the DBRE as submitted by Watts, the applicant. The process had already been determined by Watts and approved by the Board.

The second document that Plaintiffs identify is a letter opinion by James T. Murray, the Deputy Director of USDA's National Appeals Division. It provides that "[u]nder the facts presented, FCIC and RMA elected to make the crop loss harvest price equal to the projected price for all insureds because it did not receive the required percentage of reported dry bean crop harvest prices." ECF No. 102-3 ta PageID.17829. Similar to the Witt memorandum, this letter supports Defendants' assertion that it set the harvest price as directed by the DBRE. There is no indication that Defendants exercised any form of discretion in setting the harvest price.

**2.**

Plaintiffs also argue that Defendants had the authority to disregard the DBRE under 7 U.S.C. §6933. It provides:

> **(a) Establishment**
> The Secretary shall establish and maintain in the ["Department of Agriculture"] an independent Office of Risk Management.

**(b) Functions of Office of Risk Management**
The Office of Risk Management shall have jurisdiction over the following functions:

> **(1)** Supervision of the Federal Crop Insurance Corporation.

> **(2)** Administration and oversight of all aspects, including delivery through local offices of the Department, of all programs authorized under the Federal Crop Insurance Act (7 U.S.C. 1501 et seq.).

> **(3)** Any pilot or other programs involving revenue insurance, risk management savings accounts, or the use of the futures market to manage risk and support farm income that may be established under the Federal Crop Insurance Act or other law.

> **(4)** Such other functions as the Secretary considers appropriate.

7 U.S.C. §6933. Plaintiffs contend that "[w]hen faced with policy provisions or procedures – including those found in pilot programs – the RMA regularly exercises its equitable authority under 7 U.S.C. §6933 to announce changes to policy provisions and procedures." ECF No. 102 at PageID.17818. Plaintiffs then provide examples of when the RMA has issued Manager's Bulletins "explicitly recogniz[ing] that the RMA may review (reform) insurance policies or procedures when their terms make compliance unworkable, impossible, or inequitable." *Id.* at PageID.17818–17819.

However, these Manager Bulletins were not in the Administrative Record nor did Plaintiffs move to have them added to the Administrative Record when they filed their motion to supplement the record. Judicial review is generally limited to the administrative record that was before the agency at the time of its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410-20 (1971). Accordingly, these bulletins will not be considered.

## C.

Plaintiffs also argue that the discrepancy between the DBRE and the Revenue Insurance Standards Handbook ("Handbook") should be resolved so that the Handbook's pricing scheme

controls rather than the DBRE's pricing scheme. *See* Section I.A.i. The discrepancy concerns the procedure for when a harvest price cannot be determined. The DBRE provides that when the harvest price cannot be determined, it will be set to equal the projected price. ECF No. 72-1 at PageID.1662 ("If the harvest price cannot be calculated for the crop year for a type for which a projected price was determined…the harvest price will be equal to the projected price."). In contrast, the Handbook states that when the harvest price cannot be determined, the RCA will establish the harvest price. ECF No. 72-4 at PageID.1732 ("If a harvest price cannot be determined…but a projected price was established according to its definition, RMA will establish the harvest price.").

Plaintiffs contend that the Handbook procedure should be adopted rather than the DBRE procedure because the Handbook states that it provides the methods for implementing the DBRE. Plaintiffs quote the following portions of the Handbook:

> This handbook provides the official FCIC-approved 2015 and succeeding crop years underwriting and administration standards for the Dry Bean Revenue Crop Provisions under the Dry Bean Revenue Endorsement. All approved insurance providers electing to offer the Dry Bean Revenue Endorsement must utilize these standards.
>
> * * *
>
> The Dry Bean Revenue Insurance Standards Handbook provides instructions for establishing coverage in accordance with the Dry Bean Revenue Endorsement.
>
> * * *
>
> This handbook provides FCIC-approved procedures for administering the Dry Bean Revenue Endorsement.
>
> * * *
>
> AIPs that elect to offer the Dry Bean Revenue Endorsement must offer it to all eligible producers in the approved area, and must administer the program according to the procedures in this handbook.

ECF No. 102 at PageID.17814; A.R. at FCIC0000367, FCIC0000370.

Plaintiffs cite to a 9th Circuit case in which the court determined that a similar type of crop insurance policy should be construed as incorporating the requirements in the relevant handbook.

- 18 -

*Conrad v. Ace Property and Casualty Ins. Co.*, 532 F.3d 1000 (9th Cir. 2008). However, the case at hand is factually different from *Conrad*. In *Conrad*, the plaintiff was arguing that the policy calculations were different and independent from those in the handbook. In contrast, the defendants argued that the policy calculations were to be performed as directed in the handbook. The policy's language provided "[w]e recognize and apply the claim adjustment and other procedures established or approved by FCIC." *Id.* at 10003. The court interpreted this mention of FCIC as referencing the handbook. However, in the case at hand, the DBRE and the Handbook directly contradict each other regarding calculations when there is insufficient data. Unlike the handbook in *Conrad*, the DBRE does not reference the Handbook when explaining the proper calculations. Accordingly, the case differs from *Conrad* and its holding regarding handbooks is not applicable.

Defendants concede that the discrepancy between the DBRE and the Handbook exists. ECF No. 96 at PageID.17661. However, Defendants argue that Watts "drafted the handbook, and under 7 C.F.R. §400.709(a)(3) Watts is responsible for any errors." *Id.* (citations omitted). It is also significant that federal regulation expressly absolves FCIC of responsibility. 7 C.F.R. §400.709(b)(2) provides

> FCIC will not be liable for any mistakes, errors, or flaws in the policy, plan of insurance, their related materials, or the rates of premium and no cause of action may be taken against FCIC as a result of such mistake, error, or flaw in a 508(h) submission…

As explained above, FCIC is not liable for Watts's mistakes.

Additionally, the Handbook expressly states that it provides the "administration standards for the Dry Bean Revenue Crop Provisions under the Dry Bean Revenue Endorsement" and "instructions for establishing coverage in accordance with the Dry Bean Revenue Endorsement." A.R. at FCIC0000367, FCIC0000370. The Handbook is intended to instruct insurance providers how to implement the DBRE. Insofar as there is a discrepancy between the DBRE and the

Handbook, it would be illogical to conclude that the Handbook controls rather than the DBRE. The Handbook is a supplement to the DBRE, not an originating document in its own right.

## IV.

In the second count of their complaint, Plaintiffs contend that Defendants should not have approved the DBRE in 2012 and 2013 because

> [T]he DBRE lacks an essential contract provision such that the purpose of the contract and the intent of the parties are subverted by its absence. To wit, the DBRE omits the procedure to be followed "in the case that…a harvest price cannot be determined in the manner described [in the DBRE]." DBRE 7(d). The parties to the [DBRE] contract intended that the harvest price be set by the RMA based on actual market prices in the event that the harvest price could not be determined in the manner described in the DBRE.

ECF No. 72 at PageID.1658-1659. Plaintiffs contend that Defendants approving the DBRE was arbitrary and capricious. *Id.*

Plaintiffs explain that the Bean Market News is published by the Agricultural Marketing Service ("AMS"), an agency of Defendant USDA. ECF No. 97-2 at PageID.17680. Plaintiffs argue that because the Bean Market News was published by one of Defendant USDA's own agencies, Defendants should have been aware that the Bean Market News would likely provide inadequate data regarding the price of beans. *Id.* Plaintiffs argue that

> A review of Bean Market News historical data reveals that a "harvest price" under the DBRE as defined by Defendants would not have been established for small red beans in 2005, 2008, 2012, and 2013, bearing in mind that the DBRE was approved by Defendants for sale in Michigan in 2013. Similarly, Bean Market News historical data demonstrates that the "harvest price" as defined by Defendants would not have been established for navy beans in Michigan in 2008, 2012, and 2013.

ECF No. 97-2 at PageID.17680.

Plaintiffs contend that Defendants were well-aware of the risks of depending upon the Dry Beans News for information. Plaintiffs identify multiple documents within the administrative

record supporting this assertion, including the notes of Professor Barnett from Mississippi State University and Professor Piggott from North Carolina State University. Both professors opined that the reporting mechanism was potentially flawed. Plaintiffs argue that Defendants "failed to consider the expert reports prepared with respect to the DBRE §508(h) submission of Watts. The only reference in the administrative record to the expert reviews is the summary presented by Watts and Associates…" ECF No. 97-2 at PageID.17702.

However, this is belied by the administrative record which contains reports from multiple experts. One report was prepared by Acacia Economic Consulting, LLC. It provided a detailed analysis of the possibility of the AMS having insufficient data to set the harvest price. Though the report was submitted January 6, 2012, it describes exactly what in fact occurred to the Michigan dry bean farmers in 2015. Section 3.C.2 of the report provides:

> The submission proposes to estimate dry bean harvest prices as the simple average of AMS reported monthly prices for September, October, and November. Historically, there have been occasions when AMS failed to report harvest price data during these months for some types of dry beans. Typically this is due to thin market volume. As examples, consider that in 2008 AMS failed to report Minnesota/Wisconsin dark red kidney bean prices in September, October, or November. In 2009, AMS failed to report Minnesota/Wisconsin dark red kidney bean prices in September and October. In 2009, AMS failed to report Minnesota/North Dakota black bean prices in October and November.

> If AMS fails to report a price for September, October, or November, the submitter proposes to substitute the projected price for the missing month when calculating harvest price. This seems problematic given the concern described in the previous section about the potential for biases when different data generating mechanisms are used to estimate projected and harvested price.

> In the extreme case where AMS fails to report a price for September, October, and November the harvest price would be equal to the projected price and the revenue insurance product (with or without the harvest price exclusion) would revert to a yield insurance product…

> In this extreme case, insured growers would pay for revenue insurance coverage but would only receive yield insurance coverage. If AMS fails to report a price for only one or two of the three months used to estimate the harvest price, the revenue

insurance policy would revert to something of a hybrid between yield insurance and true revenue insurance, though again the insured growers would pay for revenue insurance.

We understand the need to have a contingency plan for situations when AMS fails to report a price. However, it seems unfair to growers who pay for revenue insurance for the contingency plan to effectively shift the policy away from revenue coverage and toward yield coverage.

A.R., ECF No. 83-3 at PageID.3179. The report also provided the following question and answer.

Are adequate, credible, and reliable ratemaking data available? Is it likely that the data will continue to be available? Are the data vulnerable to tampering if the proposed policy is approved?

This is perhaps the greatest challenge for the proposed insurance product. It appears that the submitter has gone to great effort to identify the best available data. However, the data are extremely limited and from multiple sources (processors, AMS, NASS, futures data for proxy crops). We are not able to assess the likelihood that processor data will continue to be available. AMS, NASS, and futures data should continue to be available although AMS has on occasions failed to report dry bean price data (see section 3.C.2 of this review). AMS, NASS, and futures data should not be vulnerable to tampering. We can make no assessment about the likelihood of price manipulations or tampering with processor data. However, we do raise concerns about potential vulnerabilities in section 3.C.3 of this review.

*Id.* at PageID.3212-3213. Defendants acknowledge that the report expresses concerns about setting the harvest price equal to the projected price when the AMS provides inadequate data. They argue that the report describes this situation as "extreme" though, making it unlikely to occur.

The other reports in the Administrative Record support Defendants' assertion. Milliman, Inc. prepared an actuarial report regarding the policy which provided:

As the projected and harvest prices directly determine the amount of indemnification, they are by definition a reasonable measure of exposure to loss and are directly responsive to changes in exposure level. When crop prices increase, the amount of revenue guarantee and the crop insurance exposure increase correspondingly and vice versa.

The proposed data sources are not subject to easy manipulation, and thus meet the criteria for ease of determination. The processor contract price data collected through the USDPLC and individually from dry bean processors are both expected

to be reliable and trustworthy sources of data. *The same can be said for the sales prices received by growers at harvest, sourced from USDPLC and AMS.*

A.R., ECF No. 83-3 at PageID.2913 (emphasis added). The report's Summary and Conclusion

provides

> The Watts analysis and recommendations toward appropriate data sources for pulse crop prices and volatility are consistent with generally accepted crop insurance ratemaking procedures, and sound actuarial principles and standards of practice. We have identified some areas where additional study may be beneficial, as noted in our report; however, there were no particular areas of concern raised by our review.

*Id.* at PageID.2919.

> Bickerstaff, Whatley, Ryan & Burkhalter, Inc. also provided an actuarial report. It posed

the following question and answer

> Is adequate, credible, and reliable data available for establishing expected market prices for insured commodities? Is it likely that the data will continue to be available? Is the data vulnerable to tampering if the proposed policy is approved? Is the data likely to be available when needed? Is the proposed system for publishing prices feasible?
>
> The price data compiled by the various trade associations appear to be very reliable and it is likely that this data will be available on a regular basis. I see no evidence that this pricing data is vulnerable to tampering.

*Id.* at PageID.3138. The report's conclusion provides

> In conclusion, I would recommend approval of this product. It appears to have been well researched and documented. Nevertheless, I would strongly recommend that examples of the final premium determination be supplied to FCIC board and other interested parties.

*Id.* at PageID.3142.

> Deloitte Consulting LLP also submitted an expert report. It provides
>
> The harvest price for dry beans is the simple average of 3 months of weekly prices contained in AMS news reports…AMS has noted that in weeks of thing trading volume, prices are not given…AMS is administered by the USDA, and thus we believe that the bean market data will continue to be available and that there is very limited opportunity for the data to be tampered with.

ECF No. 83-4 at PageID.3226.

Rimrock Reviewing also submitted an expert report in which it expressed concerns about using AMS data for establishing the harvest price. However, these concerns were not based on inadequate reporting by AMS, but rather historic price discrepancies between the AMS prices and the prices actually received. *Id.* at Page.ID 3296. In its Executive Summary, the report also listed other concerns with the proposal, but concluded by stating

> I believe these are probably minor concerns compared to the benefit that would be derived by producers from the availability provided by this summation. Hopefully the submitters can shed some light on whether these concerns are significant or not. Overall, I believe this is a viable submission.

*Id.* Later in the report, it posits that "I believe the data proposed to be used for determining the projected price and harvest price (if adjusted for quality) are appropriate, reliable, and the best available for such purposes." *Id.* at Page.ID3300.

A court may not "substitute its judgment for that of the agency." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency is only required to articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1983). A court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974).

Defendants' decision to adopt Watt's proposal with the provision setting the harvest price to the projected price when the Dry Bean News published insufficient data is a "decision of less than ideal clarity." *Id.* In situations in which there was insufficient data, the insurance purchased by farmers would be entirely negated. However, Defendants relied upon the recommendations of multiple experts who acknowledged this possibility, but nonetheless recommended that the policy

be adopted since the probability was low that the situation would occur. Defendants' reliance upon these experts was rational. Accordingly, their decision to adopt Watts's proposal was not arbitrary and capricious.

**V.**

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment, ECF No. 96, is **GRANTED**.

It is further **ORDERED** that Plaintiffs' motion for summary judgment, ECF No. 97, is **DENIED**.

It is further **ORDERED** that Plaintiffs' motion for class certification, ECF No. 103, is **DENIED** as moot.

It is further **ORDERED** that the second amended complaint, ECF No. 72, is **DISMISSED**.

Dated: July 12, 2019                                         s/Thomas L. Ludington
                                                               THOMAS L. LUDINGTON
                                                           United States District Judge