UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

GREGORY ACKERMAN,

               Plaintiffs,                                    Case No. 17-cv-11779

v.                                                              Honorable Thomas L. Ludington

UNITED STATES DEPARTMENT OF
AGRICULTURE, et al

               Defendants.
_____/

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR RECONSIDERATION**

On June 5, 2017, a group of sixty-five farmers and incorporated farms filed suit against eighteen insurance companies and three federal governmental entities: the United States Department of Agriculture, the Risk Management Agency, and the Federal Crop Insurance Corporation. ECF No. 1.

The Plaintiffs were dry bean farmers in Michigan, Minnesota, and North Dakota who purchased crop insurance under the Dry Bean Revenue Endorsement. Plaintiffs contend that the federal Defendants incorrectly calculated the "harvest price" of dry beans in 2015. Consequently, Plaintiffs did not receive indemnity for crop insurance to which they believed they were entitled to under the Dry Bean Revenue Endorsement.

Defendant United States Department of Agriculture ("USDA") "is a department of the United States Government and is the parent agency of Defendant [Risk Management Agency ("RMA")], which in turn administers Defendant [Federal Crop Insurance Corporation ("FCIC")], a wholly government-owned corporation created under the Federal Crop Insurance Act, 7 U.S.C.

§1501, et seq." *Id.* at 14. The eighteen Insurance Defendants sold insurance coverage to Plaintiffs during 2015.

On November 22, 2017, the Federal Defendants and Insurance Defendants both filed motions to dismiss. ECF Nos. 51, 52. On March 8, 2018, Plaintiffs filed a motion for leave to file a second amended complaint correcting the names of certain Plaintiffs. ECF No. 64. On April 18, 2018, the Court issued an order granting the motions to dismiss and also granting the motion for leave to file an amended complaint. ECF No. 70. The Court concluded that Plaintiffs had not complied with the insurance policies' arbitration requirements. Accordingly, all Insurance Defendants were dismissed. The Court also dismissed without prejudice all Plaintiffs who did not farm or reside in the Eastern District of Michigan, concluding that they were bringing suit in the improper venue. On April 30, 2018, Plaintiffs filed a second amended complaint. ECF No. 72.

On May 2, 2018, Plaintiffs filed a motion for reconsideration of the Court's order to dismiss. ECF No. 74. In the motion, Plaintiffs argued that the plaintiffs from outside the Eastern District of Michigan should have been transferred to the proper venue instead of dismissed. The motion was granted in part and the Minnesota Plaintiffs were transferred to the District of Minnesota. ECF No. 80.

On October 31, 2018, Plaintiffs filed a motion for supplementation of the administrative record. ECF Nos. 86, 87. Plaintiffs contended that information was excluded from the Administrative Record that was necessary for the Court to determine whether Defendants acted arbitrarily and capriciously. *Id.* The Court determined that the Administrative Record adequately addressed the matters in question and the motion was denied. ECF No. 91.

On April 1, 2019, both Plaintiffs and the federal Defendants filed cross-motions for summary judgment. ECF Nos. 96, 97. The Court determined that the federal Defendants acted

consistent with federal law and regulations. ECF No. 109. It denied Plaintiffs' motion, granted Defendants' motion, and dismissed Plaintiffs' amended complaint.

Plaintiffs filed a motion for reconsideration of the Court's previous order. ECF No. 111. For the following reasons, the motion will be denied.

## I.

Plaintiffs are bringing this putative class action "on behalf of all dry bean farmers in the Eastern District of Michigan (navy [pea] beans or small red beans)." Second Am. Compl. at 2, ECF No. 72. Each Plaintiff purchased Dry Bean Revenue Endorsement ("DRBE") crop insurance for their dry bean crops in 2015. *Id.* "The purpose of this insurance was to protect dry bean farmers against a market price decline." *Id.* However, Plaintiffs allege that though "dry bean market prices declined greatly in 2015, no indemnity was paid to Plaintiffs." *Id.* In the present suit, Plaintiffs seek a declaratory judgment invalidating certain administrative determinations related to the Dry Bean Revenue Endorsement ("DBRE") and ordering Defendants to ensure that Plaintiffs' losses are indemnified or their premiums reimbursed. *Id.* at 2–3.

### A.

Congress passed the Federal Crop Insurance Act in 1938 in order to "promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance and providing the means for the research and experience helpful in devising and establishing such insurance." 7 U.S.C. §1502(a). The act includes a provision permitting the Federal Crop Insurance Corporation to conduct pilot programs for proposed crop insurance. 7 U.S.C. §1523(a)(1). Those proposed programs must be submitted to the FCIC Board. The Board then evaluates "whether a proposal or new risk management tool tested by the pilot program is

suitable for the marketplace and addresses the needs of producers of agricultural commodities." 7 U.S.C. §1523(a)(1).

The current dispute arises out of a pilot program developed by Watts and Associates ("Watts"), a "privately owned economic consulting firm located in Billings, Montana." Second Am. Compl. at 15. The FCIC Board approved the program, titled Dry Bean Revenue Endorsement, in 2012 for dry bean crops in Minnesota and North Dakota. *Id.* The pilot program became effective in 2013. *Id.* FCIC approved an expansion of the pilot program to include farmers in Michigan, effective in 2014. *Id.* Pursuant to that expansion, Michigan dry bean farmers "purchased 1,286 DBRE policies, covering 151,464 acres" in 2015. *Id.*

The DBRE provides that farmers may elect its coverage only if they already have the "Common Crop Insurance Policy" and the "Dry Bean Crop Provisions" in force. DBRE at 1(b), ECF No. 50, Ex. A. The Common Crop Insurance Policy permits farmers to elect either revenue protection or yield protection for certain crops, not including dry beans. CCIP 2010 Amendments at 1, ECF No. 50, Ex. B. "Revenue protection provides protection against loss of revenue caused by price changes or low yields or a combination of both." *Id.* "Yield protection provides protection for production losses only." *Id.* "For crops for which revenue protection is available, a projected price and a harvest price will be determined in accordance with the Commodity Exchange Price Provisions." *Id.* Yield protection guarantees are "determined by multiplying the production guarantee by the projected price." *Id.* Thus, for yield protection, the "harvest price is not used." *Id.* Revenue protection guarantees are "determined by multiplying the production guarantee by the greater of the guaranteed price or the harvest price." *Id.* "The projected price is used to determine the premium, and any replant payment or prevented planting payment. The harvest price is used to value the production to count." *Id.*

Under the Common Crop Insurance Policy and the Dry Bean Crop Provisions addendum, dry bean farmers do not have the option of obtaining revenue protection. Rather, they are limited to yield protection guarantees. DBRE, however, provides dry bean farmers access to revenue protection guarantees.

**1.**

DBRE offers two kinds of revenue protection: revenue protection without harvest price exclusion and revenue protection with harvest price exclusion. The coverage for both kinds of protection is calculated similarly. The first step is determining the projected price for dry beans. On or before February 15 of the crop year, the RMA must collect the "offer price and expected contract volume" from dry bean buyers for the various types of dry beans covered by the DBRE. DBRE §7(e)(1)(A). After reviewing that information, the RMA will announce projected prices for bean types "no later than the third business day of March." *Id.* at §(e)(1)(D). The projected price provides the baseline guarantee for purposes of revenue protection.

Not later than December 15 of the harvest year, the RMA must announce the "harvest price" for each type of bean. *Id.* at §(e)(2)(E). The harvest price is determined pursuant to the following procedure: "The market price of each type for each day of publication during the period beginning on the first business day in September and ending on the last business day of November will be collected." *Id.* at §(e)(2)(A). The "publication" mentioned in §(e)(2)(A) refers to the "Bean Market News, a publication of the Agricultural Marketing service, USDA," which publishes weekly market prices for specific types of dry beans in specific regions. §2. Typically, the market price will be "the sum of the market prices for that type divided by the number of prices included in that sum." *Id.* at §(e)(2)(D). If the reported market price for a certain date is qualified by "terms that indicate a small volume of sales or no sales" occurred on that date, that market activity will

be disregarded for purposes of calculating the market price. *Id.* at §(e)(2)(B). And, "if there is a market price for fewer than 50 percent of the dates of publication," no harvest price will be established. *Id.* at §(e)(2)(C).

The DBRE also provides contingencies for the event that either the projected price or harvest price cannot be calculated pursuant to the procedure provided above. Section 7(e)(3) indicates that, "[i]f a projected price for any of these types cannot be determined as described herein; . . . [t]he projected price will be determined by RMA and announced not later than the third business day of March; and . . . [t]he harvest price will equal the projected price." Section 3(c)(1) explains that if a projected price cannot be calculated for a type of dry bean, coverage for that type of bean will be subject to the terms of §7(e)(3). Section 3(c)(2) provides that "[i]f the harvest price cannot be calculated for the crop year for a type for which a projected price was determined in accordance with section 7 of this endorsement, the harvest price will be equal to the projected price."

**2.**

The DBRE provides three examples which demonstrate how indemnity is calculated. First, if a farmer chooses yield protection but not revenue protection, the DRBE protections will not apply. In that scenario, the farmer obtains yield protection for a specific number of acres and a specific production guarantee per acre. *See* §5 Example 1. In the example provided, the farmer insured 50 acres with a 1,600 lbs. per acre production guarantee, which totaled an 80,000 lbs. production guarantee. *Id.* That guarantee is multiplied by the projected price for the type of bean, and the resulting sum is the value of the guarantee (in the example, $22,400). If the farmer's actual yield is 25,000 lbs., that amount is multiplied by the projected price and then subtracted from the

total guarantee. The difference between the value of the total guarantee and the farmer's actual production (measured by reference to the projected price) is the farmer's indemnity.

The second example involves a farmer choosing revenue protection (meaning the DBRE terms apply) but not harvest price exclusion. In this scenario, the "revenue protection guarantee [is] calculated using the harvest price" if the harvest price is higher than the projected price. Otherwise, the farmer "must accept 100 percent of the projected price." *Id.* at Example 2. In other words, the production guarantee is multiplied by the harvest price (not the projected price) to create the revenue protection guarantee. Similarly, the farmer's actual production is multiplied by the harvest price and that sum is subtracted by the amount of the revenue protection guarantee. The difference is the farmer's indemnity. *See id.*

In the third example, the farmer chooses both revenue protection and a harvest price exclusion. This is a variation on DBRE coverage. When these coverage options are chosen, the "revenue protection guarantee is based on the projected price and the production to count is valued using the harvest price." *Id.* at Example 3. In other words, the revenue protection guarantee is calculated by multiplying the production guarantee by the projected price. The farmer's actual production is multiplied by the harvest price, and the value of the actual production is subtracted from the revenue protection guarantee. The remaining sum is the farmer's indemnity.

Thus, farmers who choose only yield protection do not receive additional indemnity if the market price is lower than the projected price. Farmers who choose revenue protection without the harvest price exclusion are guaranteed to receive full market-value compensation for their production guarantee and perhaps more, if the harvest price is lower than the projected price. Farmers who choose revenue protection with the harvest price exclusion are guaranteed to receive

the full projected price for their production guarantee, with the amount of indemnity decreasing if the harvest price exceeds the projected price.

Because they are receiving greater protection, farmers who choose revenue protection pay a higher premium than farmers who choose only yield protection. Second Am. Compl. at 20. Nevertheless, if the harvest price equals the projected price, farmers covered by both kinds of protection receive identical indemnification.

**B.**

Plaintiffs allege that, in 2015, "the Bean Market News did not publish market prices for navy and small red beans in Michigan or for dark red kidney beans in Minnesota and North Dakota for 50% or more of the publishing dates between September and November." *Id.* at 17. In fact, Plaintiffs further allege that only once in the preceding eight years had the Bean Market News published market prices for 50% or more of its publishing dates between September and November. *Id.* Accordingly, Plaintiffs contend that "it was not just foreseeable, but very likely, that the Bean Market News would not publish the specified number of market prices during the specified period in 2015." *Id.*

Plaintiffs argue that the "[a]ctual market prices" for navy, small red, and dark red kidney beans were contemporaneously available and remain available from the grain elevator processors which actually bought the insured beans from the Plaintiffs. *Id.* at 18. The actual market price showed "a great decline from the projected prices for the subject beans." *Id.* Because the Bean Market News had not published a sufficient number of market prices for the dates in question, "the RMA set the harvest prices . . . at an amount equal to the projected prices" on December 15, 2015. *Id.* at 19. Plaintiffs argue that this act "was contrary to law [and] contrary to the intent and purpose of the DBRE" because it "negated the revenue protection insurance provided by the DBRE [and]

. . . deprived Plaintiffs of the DBRE indemnity to which they are entitled." *Id.* Plaintiffs' alleged injury has been exacerbated because the Defendant insurers have "retained the additional premium paid by Plaintiffs for DBRE coverage" even though, in Plaintiffs' view, they did not actually receive revenue protection. *Id.*

## C.

On February 16, 2016, Plaintiff Greg Ackerman, the chair of the Michigan Bean Commission, and Carl Bednarski, President of the Michigan Farm Bureau, "sent a request to FCIC's Board of Directors requesting that the harvest price be recalculated so that it reflected the actual market price." *Id.* (citing Feb. 16, 2016, Letter, ECF No. 72, Ex. E). That request was denied by the Chairman of FCIC, Dr. Robert Johansson, on March 8, 2016. *Id.* (citing March 8, 2016, Denial, ECF No. 72, Ex. F). Ackerman subsequently requested "a determination from the RMA and the National Appeals Division (NAD) of the USDA that the March 8, 2016 letter of Dr. Johansson constituted a 'determination made by FCIC that is a matter of general applicability [that] is not subject to administrative review.'" *Id.* (citing 7 C.F.R. 400.91(e)). The RMA "'decline[d] to render a determination of general applicability . . . because the RMA has not made any determinations in regard to your client's policy.'" *Id.* at 19–20. (quoting April 28, 2016, RMA Letter, ECF No. 72, Ex. G). On June 6, 2016, the NAD sent Ackerman a letter summarizing Ackerman's request and objections and concluding that "[t]he March 8, 2016, FCIC decision is not appealable because it establishes program eligibility requirements that are generally applicable to all participants." NAD Determination, ECF No. 72, Ex. H; Second Am. Compl. at 20.

Plaintiffs' second amended complaint includes two counts. In the first count, Plaintiffs argue that Defendants' interpretation of the DBRE was arbitrary and capricious.

> [T]he administrative determinations of FCIC and RMA of December 15, 2015 and March 8, 2016 interpreting the DBRE to require the harvest price to be set equal to

the projected price . . . were arbitrary, capricious, an abuse of discretion, and not in accordance with law; were contrary to statutes and other law; were without observance of procedure required by law; and were unwarranted by the facts.

Second Am. Compl. at 20.

In the second count, Plaintiffs contend that Defendants should not have approved the DBRE in 2012 and 2013 because

[T]he DBRE lacks an essential contract provision such that the purpose of the contract and the intent of the parties are subverted by its absence. To wit, the DBRE omits the procedure to be followed "in the case that…a harvest price cannot be determined in the manner described [in the DBRE]." DBRE 7(d). The parties to the [DBRE] contract intended that the harvest price be set by the RMA based on actual market prices in the event that the harvest price could not be determined in the manner described in the DBRE.

*Id.* at 21. Plaintiffs further allege that "the RMA and FCIC are required by 7 U.S.C. §1508(c)(5) to set harvest prices that reflect actual market prices." *Id.* Plaintiffs allege that

[E]ither the Plaintiffs and the insurance companies both believed and relied on the RMA and FCIC's averment that the DBRE in fact provided revenue protection insurance coverage to Plaintiffs, or, Plaintiffs unilaterally believed that the DBRE provided such coverage and acted in reliance on that belief, while the insurers knew that it did not, but accepted payment of DBRE premiums by Plaintiffs knowing, there was no DBRE coverage.

*Id.* at 22. For that reason, they believe that "[t]his mutual mistake or unilateral mistake with fraud necessitates reformation of the DBRE to reflect the intent of the parties at the time of contracting." *Id.*

### D.

The Court denied Plaintiffs' motion for summary judgment, granted Defendants' motion for summary judgment, and dismissed Plaintiffs' complaint. ECF No. 109. The Court determined that pursuant to the Federal Crop Insurance Act and accompanying regulations, Defendants correctly implemented the DBRE. Accordingly, defendants did not have the authority to set the harvest price to the market price rather than that projected price.

Plaintiffs filed their motion for reconsideration two weeks later. ECF No. 111. The Court directed Defendants to file a response, which they did. ECF No. 112, 113.

**II.**

Pursuant to Eastern District of Michigan Local Rule 7.1(h), a party can file a motion for reconsideration of a previous order, but must do so within fourteen days of the order's entry. A motion for reconsideration will be granted if the moving party shows: "(1) a palpable defect, (2) the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case." *Michigan Dept. of Treasury v. Michalec*, 181 F. Supp. 2d 731, 733-34 (E.D. Mich. 2002) (quoting E.D. Mich. LR 7.1(g)(3)). A "palpable defect" is "obvious, clear, unmistakable, manifest, or plain." *Id.* at 734 (citing *Marketing Displays, Inc. v. Traffix Devices, Inc.*, 971 F. Supp. 2d 262, 278 (E.D. Mich. 1997)). "[T]he Court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the Court, either expressly or by reasonable implication." E.D. Mich. L.R. 7.1(h)(3). *See also Bowens v. Terris*, No. 2:15-CV-10203, 2015 WL 3441531, at *1 (E.D. Mich. May 28, 2015).

**III.**

Plaintiffs contend that the Court erred by not addressing Plaintiffs' argument regarding the RMA's authority to resolve defects within policies, by not fully addressing Count I of Plaintiffs' amended complaint, and by not fully addressing Count III of Plaintiffs' amended complaint. ECF No. 111. Each of these arguments will be addressed in turn.

**A.**

Plaintiffs claim that the Court did not address its argument that the RMA has the authority to "provide relief when a crop insurance policy's fundamental flaw becomes manifest in the middle of the crop year." ECF No. 111 at 4.

In their response to Defendants' motion for summary judgment, Plaintiffs had argued that "[t]he RMA exercises this authority by issuing Manager's Bulletins. Several Manager's Bulletins have explicitly recognized that the RMA may revise (reform) insurance policies or procedures when their terms make compliance unworkable, impossible, or inequitable." ECF No. 102 at Page ID.17819. Plaintiffs then listed multiple instances in which the RMA issued Manager's Bulletins to correct errors under other insurance policies. *Id.* at PageID.17819-17820.

The Court did not address this argument on the merits because the Manager's Bulletins were not in the administrative record. The Court's opinion and order provides:

> Plaintiffs contend that "[w]hen faced with policy provisions or procedures – including those found in pilot programs – the RMA regularly exercises its equitable authority under 7 U.S.C. §6933 to announce changes to policy provisions and procedures." ECF No. 102 at PageID.17818. Plaintiffs then provide examples of when the RMA has issued Manager's Bulletins "explicitly recogniz[ing] that the RMA may review (reform) insurance policies or procedures when their terms make compliance unworkable, impossible, or inequitable." *Id.* at PageID.17818–17819.
>
> However, these Manager Bulletins were not in the Administrative Record nor did Plaintiffs move to have them added to the Administrative Record when they filed their motion to supplement the record. Judicial review is generally limited to the administrative record that was before the agency at the time of its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410-20 (1971). Accordingly, these bulletins will not be considered.

ECF No. 109 at PageID.17906-17907.

In their motion for reconsideration, Plaintiffs argue that

> The Court quotes the statute and notes that Plaintiffs' argument would be supported by Defendant RMA's Manager's Bulletins; however, the Court then states that because the Manager's Bulletins were not part of the administrative record they would not be considered by the Court.

ECF No. 111 at PageID.17921. Contrary to Plaintiffs' allegation, the opinion did not represent that Plaintiffs' argument would be supported by the RMA bulletins. The Court determined that the

bulletins would not be considered because they were not part of the administrative record. It made no other determinations regarding Plaintiffs' argument.

Plaintiffs mentioned these bulletins in their 2017 response to Defendants' motion for partial summary judgment. ECF No. 59 at PageID.1200-1201. However, they made no mention of the bulletins in their motion to supplement the record nor in their motion for summary judgment. ECF No. 87, 97. It was not until their response to Defendants' motion for summary judgment that Plaintiffs discussed these bulletins in the context of the current motions for summary judgment. ECF No. 102.

Plaintiffs contend that the Court committed palpable error by refusing to consider these bulletins. This is despite the fact that the bulletins do not appear in the administrative record, in Plaintiffs' motion to supplement the record, nor in Plaintiffs' motion for summary judgment. Plaintiffs argue that "the Court should have taken judicial notice" of the bulletins because they were "referenced by Plaintiff to demonstrate points of law, and not points of fact." ECF No. 111 at PageID.17921. This is the first time the Court is being presented with the argument that it should take judicial notice of these bulletins. Palpable error cannot be committed in failing to address an issue that was never presented. Plaintiffs present no authority that a Court should take judicial notice of documents outside of the administrative record when neither side has asked the Court to take judicial notice of the documents in the first instance.

**B.**

Plaintiffs next contend that the Court did not fully address Count I of its complaint. ECF No. 111 at PageID.17924. Plaintiffs argue that the Court only reached a determination regarding whether Defendants' actions were arbitrary and capricious, but did not determine whether Defendants' actions were "an abuse of discretion, and not in accordance with the law; were

contrary to statutes and other law; were without observance of procedure required by law; and were unwarranted by the facts." ECF No. 72.

When a court reviews an action by a federal agency, the Administrative Procedure Act requires that the court:

[H]old unlawful and set aside agency action, findings, and conclusions found to be-

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. §706.

5 U.S.C. §706 was properly applied in determining that Defendants' actions were not arbitrary and capricious. The Court's analysis was grounded in statutory law, common law, federal regulations, and the facts of the case. It determined that Defendants complied with the relevant laws and regulations.

**C.**

Plaintiffs' final contention is that the Court did not address Plaintiffs' argument that Defendants would have realized that the DBRE was untenable had they considered the historical absence of information provided to the Bean Market News. The argument was addressed in Section IV of the opinion. ECF No. 109 at PageID.17910-17915. It provides:

> Plaintiffs argue that because the Bean Market News was published by one of Defendant USDA's own agencies, Defendants should have been aware that the Bean Market News would likely provide inadequate data regarding the price of beans.

*Id.* at PageID.17910. The Court then went on to explain that Defendants acted reasonably in relying upon the reports from multiple experts recommending the DBRE. Contrary to Plaintiffs' contention, five pages of the opinion were dedicated to Plaintiffs' argument.

**IV.**

Accordingly, it is **ORDERED** that Plaintiffs' motion for reconsideration, ECF No. 111, is **DENIED**.


Dated: December 16, 2019                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge