UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ACKERMAN BROTHERS FARMS, LLC,
*et al.*,

        Plaintiffs,        Case No. 1:17-cv-11779

v.        Honorable Thomas L. Ludington
        United States District Judge

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

        Defendants.
_____/

**OPINION AND ORDER REMANDING AGENCY ACTION FOR FURTHER REVIEW
AND DENYING PLAINTIFFS' MOTION TO CERTIFY AS MOOT**

This matter is before this Court on remand from the Sixth Circuit Court of Appeals. *See Ackerman v. U.S. Dep't of Agric.*, 995 F.3d 528 (6th Cir. 2021). For the reasons stated hereafter, the Federal Crop Insurance Corporation's decision to approve the Michigan expansion of the Dry Bean Revenue Endorsement will be remanded to the Agency for further review, and Plaintiffs' Motion to Certify, ECF No. 134, will be denied as moot.

**I.**

Unless otherwise noted, the facts stated in this Section are from the Sixth Circuit's opinion. *See Ackerman*, 995 F.3d 528.

**A.**

At the center of this case is the Federal Crop Insurance Corporation (FCIC) and its crop-insurance program. Since 1938, the Federal Government has been in the business of offering crop insurance to farmers directly through the FCIC. With the enactment of the Federal Crop Insurance

Act of 1980 (FCIA), 7 U.S.C. § 1501 *et seq.*, Congress opened the crop-insurance market to private actors, allowing them to offer FCIC-approved policies.

Among other things, the FICA allows a private actor to propose a new policy for FCIC approval, including "a new kind of coverage for a commodity that [has] previously had no available crop insurance." 7 U.S.C. § 1508(h)(3)(A)(ii)(III). To propose a new policy, the private actor must apply to the FCIC with a "508(h) submission" analyzing the proposed policy and its terms. *Ackerman*, 995 F.3d at 530 (citing 7 C.F.R. § 400.705). The FCIC forwards complete applications to at least five experts for review. 7 C.F.R. § 400.706(b)(2). According to § 1508(h), the FCIC "shall" approve the application if it determines, among other things, that the new policy "adequately protect[s]" "the interests of producers." 7 U.S.C. § 1508(h)(3)(A). Once a new policy is approved, the FCIC publishes a handbook that provides "the FCIC-approved procedures for administering the policy." *Ackerman*, 995 F.3d at 530 (internal quotation marks omitted). A private actor may propose changes to a policy after its initial approval, "but the FCIC must review any 'significant changes' as a new 508(h) submission." *Id.*

In 2011, the consulting firm Watts and Associates, Inc. ("Watts") proposed a pilot program for revenue protection for dry-bean farmers in Minnesota and North Dakota (the "Minnesota submission"). Revenue protection is a form of crop insurance that "provides protection against loss of revenue due to a production loss, price decline or increase, or a combination of both." 7 C.F.R. § 457.8. As relevant here, revenue protection pays the farmer if the "harvest price" for her crop (i.e., the actual market price that year) falls below the "projected price" (i.e., the price projected annually by the FCIC or its parent agency, the Risk Management Agency (RMA)).

At the time of Watts's proposal, however, dry beans lacked a commodities exchange that could be used to set harvest prices and projected prices. So, Watts proposed a different method:

The RMA would set the projected price using the prices offered by dry-bean processors before the planting season, and it would set the harvest price using the market prices reported weekly by the Bean Market News, a federal publication. If the Bean Market News did not report enough data, which happened before, the "harvest price [would] be determined and announced by the FCIC," presumably based on any available data. *Ackerman*, 995 F.3d at 531 (quoting the Minnesota submission).

In March 2012, the FCIC approved Watts's Minnesota submission. Yet for some reason, the actual policies sold in Minnesota and North Dakota did *not* provide the Minnesota submission's fallback provision. Instead, those policies provided that if the Bean Market News did not report enough data, "the harvest price [would] be *equal* to the projected price." *Id.* (emphasis added). Because revenue protection indemnifies farmers only when the harvest price falls *below* the projected price, the new fallback provision risked rendering the policies sold in Minnesota and North Dakota "virtually worthless." *Id.*

In 2013, Watts applied to expand its pilot program to Michigan (the "Michigan submission" or "Michigan expansion"). But the Michigan submission contained an important discrepancy: the proposed *handbook* included the Minnesota submission's fallback provision, but the proposed *endorsement* included the actual fallback provision sold in Minnesota and North Dakota. In other words, if the Bean Market News did not report enough data, the handbook would leave farmers with some protection (an FCIC-announced harvest price), while the endorsement would leave them empty-handed (a harvest price equal to the projected price). In August 2013, the FCIC determined that Watts's Michigan submission amounted to a "non-significant change" to the Minnesota submission and therefore approved it. *Id.*

**B.**

In 2015, Plaintiffs, a group of Michigan dry-bean farmers, purchased Watts's revenue protection under an endorsement named the "Dry Bean Revenue Endorsement" (DBRE). That year, a bountiful harvest produced the perfect storm: market prices sank below projected prices, and the Bean Market News did not report enough data to set harvest prices. As a result, the harvest price for some dry beans defaulted to the projected price, leaving Plaintiffs empty-handed.

In June 2017, Plaintiffs brought this action under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, naming the FCIC, the RMA, the Department of Agriculture, and various insurers as Defendants. ECF No. 1. Plaintiffs claimed that the FCIC's approval of the Michigan submission was arbitrary and capricious, and asked this Court to enter an order compelling the RMA to set a harvest price. *Id.* at PageID.23–24. All claims against the insurers were dismissed due to a binding arbitration agreement. ECF No. 70 at PageID.1632.

At the summary-judgment stage, Defendants represented to this Court that the fallback provisions in the Minnesota and Michigan submissions were the same; they even purported to quote from the Minnesota submission in their briefing. *See* ECF No. 96 at PageID.17651. Based largely on that representation, this Court entered summary judgment for Defendants and dismissed the case.

Yet as the Sixth Circuit noted on appeal, Defendants' representation was false. The Minnesota submission required the FCIC to announce the harvest price; it did not, as Defendants represented, require the harvest price to be set equal to the projected price. "That change was plainly 'significant'" under the FCIC's regulations, so the FCIC should have "treat[ed] the Michigan submission as 'a new 508(h) submission' and . . . 'forward[ed] [it] to at least five expert reviewers[.]'" *Ackerman*, 995 F.3d at 533 (quoting 7 C.F.R. §§ 400.709, 400.706). Because the

FCIC did not do so, its decision to approve the Michigan submission was "without observance of procedure required by law." *Id.* (quoting 5 U.S.C. § 706(2)(D)). The Sixth Circuit thus reversed summary judgment for Defendants and remanded the case to this Court for "further proceedings." *Id.* at 534.

## C.

Because the only remaining issue is the remedy for the FCIC's procedural violation, this Court directed the parties to file supplemental briefing explaining their proposed remedies. Both sides have since filed responsive briefing. ECF Nos. 132 (Pls.' Supp. Br.); 133 (Defs.' Supp. Br.).

## II.

As indicated, this Court must determine the appropriate remedy for the FCIC's deficient approval of the Michigan expansion. The APA provides that when a reviewing court finds an agency action to be unlawful, the reviewing court "shall . . . set [that action] aside." 5 U.S.C. § 706(2). Accordingly, "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019); *see also Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) ("Vacatur of agency action is a common, and often appropriate form of injunctive relief granted by district courts."), *reh'g denied* (June 24, 2019). Yet here, neither side seeks to vacate the FCIC's decision. Instead, they seek a more equitable remedy.

Plaintiffs seek to have the DBRE policies reformed under a theory of mutual mistake. ECF No. 132 at PageID.18029–30. Consistent with the Minnesota submission's fallback provision, the new policies would require the FCIC to announce a harvest price *Id.*

By contrast, Defendants seek to have the FCIC's decision remanded for further review but without vacatur. ECF No. 133 at PageID.18042. Vacating the decision, they argue, would needlessly disrupt the reliance interests of farmers and insurers. *Id.* at PageID.18047.

For the reasons discussed below, this Court will adopt Defendants' proposed remedy and remand the FCIC's decision for further review without vacatur.

### A.

"It is well-established that federal courts possess broad discretion to fashion equitable remedies." *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004). This discretion includes the power to "craft declaratory and injunctive relief designed to preclude a federal agency from acting in contravention of its statutory and regulatory authority." *Id.* Importantly, though, such equitable discretion is necessarily limited by what a court "deem[s] necessary and appropriate" in a particular case. *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999). In other words, a federal court's remedial power "[is] not unlimited." *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990). Plaintiffs' proposed remedy—reforming the DBRE policies to require an FCIC-announced harvest price—would exceed this Court's authority.

To begin, Plaintiffs have not identified any case in which a federal court reformed a crop-insurance policy as relief for an APA violation. The most analogous case that Plaintiffs cite is *Wiley v. Glickman*, a case from the District of North Dakota in which the court enjoined the FCIC from enforcing an improper policy amendment. No. A3-99-32, 1999 WL 33283312, at *17 (D.N.D. Sept. 3, 1999). But the farmers in *Wiley* did not seek to rewrite their policies, as Plaintiffs do here; they sought an injunction to prevent the FCIC from enforcing an improper amendment.

*Id.* at *10. Plaintiffs request for relief is decidedly more extraordinary, and the lack of any authority supporting their request suggests that it is neither necessary nor appropriate.

Additionally, Plaintiffs have not shown that they would be entitled to reformation under Michigan law.[1] In Michigan, "[c]ourts may reform a contract where there has been a mutual mistake made by the parties or where there is a mistake by one party and fraud or inequitable conduct by the other." *Stein, Hinkle, Dawe & Assocs. v. Cont'l Cas. Co.*, 313 N.W.2d 299, 303 (Mich. Ct. App. 1981). A "mutual mistake" is "an erroneous belief, which is shared and relied on by both parties, about a material fact that affects the substance of the transaction." *Ford Motor Co. v. City of Woodhaven*, 716 N.W.2d 247, 256 (Mich. 2006). To obtain reformation, the plaintiff "must prove [the] mutual mistake of fact, or mistake on one side and fraud on the other, by clear and convincing evidence." *Casey v. Auto Owners Ins.*, 729 N.W.2d 277, 285 (Mich. Ct. App. 2006) (per curiam); *accord Loc. Union 2-2000 v. Coca-Cola*, 547 F. App'x 707, 714 (6th Cir. 2013); *McPeek v. Allstate Vehicle*, 331 F. Supp. 3d 750, 756 (E.D. Mich. 2018).

Plaintiffs argue that the "true intent of the parties"—by which they presumably mean themselves and the insurers—"was to issue Board-approved revenue coverage . . . that 'adequately "protect[s] farmers" interests.'" ECF No. 132 at PageID.18030 (quoting *Ackerman*, 995 F.3d at 530). This "true intent," Plaintiffs argue, was "embodied in the [Minnesota submission]." *Id.* at PageID.18031. Yet through some mistake, Plaintiffs were offered and ultimately purchased "unapproved DBRE [insurance]," containing "an unapproved [fallback] provision . . . [that] failed to adequately protect [their] interests." *Id.* Therefore, Plaintiffs argue, the policies they purchased did not "express the real intentions of the parties." *Id.*

---

[1] Plaintiffs rely exclusively on Michigan law in their briefing. *See* ECF No. 132 at PageID.18029.

Plaintiffs' argument is unpersuasive for several reasons. First, they conflate the Minnesota submission with the Michigan submission. Only the DBRE insurance sold in Minnesota and North Dakota could be characterized as "unapproved." The DBRE insurance sold in Michigan *was* approved—albeit "without observance of procedure required by law." *Ackerman*, 995 F.3d at 533 (quoting 5 U.S.C. § 706(2)(D)). Second, in claiming that their "true intent" was to purchase coverage that "adequately protects the interests of farmers," Plaintiffs cast their mistake as one of law—that is, a mistake concerning the legal effect of their agreement rather than its substance. But in Michigan, it is well-settled that a "mistake [of] law . . . is not a basis for reformation." *Casey*, 729 N.W.2d at 285. Third, even if Plaintiffs purchased the DBRE policies due to an erroneous belief, Plaintiffs have not offered any evidence—let alone clear and convincing evidence—that the insurers shared that belief. At bottom, a mutual mistake is an erroneous belief "shared and relied on by both parties." *City of Woodhaven*, 716 N.W.2d at 256. A unilateral mistake about the terms of insurance coverage does not justify reformation. *Cf. Casey*, 729 N.W.2d at 285 (declining to reform insurance contract where "[insureds] were unilaterally mistaken about the terms of their policy").

Plaintiffs' proposed remedy also raises significant constitutional questions. As indicated, the insurers that sold the DBRE policies were dismissed from this case over two years ago. *See supra* Section I.B. Presumably, those insurers would have a constitutionally protected interest in contesting the reformation of their insurance agreements. Thus, it is unclear whether an order rewriting the DBRE policies would pass constitutional muster. Even so, because Plaintiffs' request will be denied, this Court need not reach any constitutional questions. For all these reasons, this Court declines to reform the DBRE policies.

**B.**

Defendants' remedy—remanding the FCIC's decision without vacatur—also relies on this Court's broad remedial discretion. But unlike reformation, remand without vacatur is a well-recognized remedy in the APA context. In the seminal case *Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, the D.C. Circuit held that courts should consider two factors when deciding whether to vacate an unlawful agency action: (1) "the seriousness of the [agency] order's deficiencies" and (2) "the disruptive consequences of an interim change that may itself be changed." 988 F.2d 146, 150–51 (D.C. Cir. 1993). Relying on *Allied-Signal*, Defendants argue that the FCIC's decision should be remanded without vacatur to protect the reliance interests of Michigan farmers and insurers.

Notably, the Sixth Circuit has not expressly approved of remand without vacatur in the APA context. Even so, the great weight of authority favors recognizing the remedy. *See, e.g.*, *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1289 (11th Cir. 2015) ("We agree, as have most other courts, that the . . . remedy of remand without vacatur is within a reviewing court's equity powers under the APA." (internal quotation marks omitted)); Administrative Conference Recommendation 2013-6, Remand Without Vacatur (Dec. 5, 2013), https://www.acus.gov/sites/default/files/documents/Remand%20Without%20Vacatur%20_%20Final%20Recommendation.pdf [https://perma.cc/QE73-6Y6G] ("Remand without vacatur should continue to be recognized as within the court's equitable remedial authority on review of cases that arise under the [APA] and its judicial review provision . . . ."); Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 DUKE L.J. 291, 292 (2003) ("[S]ection 706 should not be read literally, but rather in light of a

longstanding canon of statutory construction that disfavors interpretations that would displace the equitable remedial discretion of the federal courts.").

Indeed, every court of appeals to consider the issue has recognized the power of reviewing courts to remand an agency action without vacatur. *See, e.g.*, *Black Warrior Riverkeeper*, 781 F.3d at 1289; *NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam); *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001); *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1380 (Fed. Cir. 2001); *Cent. & S. W. Servs. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000). This fact is particularly persuasive because the Sixth Circuit "routinely look[s] to the majority position of other Circuits in resolving undecided issues of law." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 278 (6th Cir. 2010).

Further, the Southern District of Ohio recently remanded an agency action without vacatur under similar circumstances. In *Center for Biological Diversity v. United States Forest Service*, a group of nonprofit organizations sued the United States Forest Service (USFS) and related agencies under the APA for violating the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4331 *et seq.* No. 2:17-CV-372, 2021 WL 855938, at *1 (S.D. Ohio Mar. 8, 2021). The suit stemmed from the USFS's decision to lease land in the Wayne National Forest for fracking. *Id.* The court ultimately found that the USFS violated NEPA by refusing to take a "hard look" at the impacts of fracking before leasing the land. *Id.* At the remedy stage, the plaintiffs sought to vacate the USFS's decision, but the defendants argued that vacatur would needlessly prejudice the lessees. *Id.* Finding *Allied-Signal* and subsequent authority persuasive, the *Biological Diversity* court balanced the relevant equities and ultimately remanded the USFS's decision without vacatur. *Id.* at *2–4.

This Court finds *Biological Diversity* persuasive and will therefore adopt the *Allied-Signal* test for purposes of this Opinion and Order. Thus, to determine whether the FCIC's decision should be vacated, this Court must weigh two factors: (1) "the seriousness" of the FCIC's errors and (2) "the disruptive consequences" of vacating the FCIC's decision. *See Allied-Signal*, 988 F.2d at 150–51. "Neither factor is dispositive; rather, the 'resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives.'" *Biological Diversity*, 2021 WL 855938, at *1 (quoting *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015)).

**i.**

The first factor—the seriousness of the FCIC's errors—weighs in favor of vacatur. According to the Sixth Circuit, the FCIC erred in failing to refer the Michigan submission for expert review and in otherwise failing to treat it as a "new 508(h) submission." *Ackerman*, 995 F.3d at 533. In similar contexts, such procedural flaws typically weigh in favor of vacatur. *See Burwell*, 139 F. Supp. 3d at 268 (discussing weight of procedural flaws such as lack of notice and comment). Still, courts often find that an error does not warrant vacatur when there is a "serious possibility that the [agency] will be able to substantiate its decision on remand." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017); *see also Biological Diversity*, 2021 WL 855938, at *3 (finding that failure to take a "hard look" did not warrant vacatur given the likelihood that the USFS would substantiate its decision on remand).

Here, there is a good possibility that the FCIC will be able to substantiate its decision on remand. First, as Defendants note, expert review of the policies sold to the farmers in Michigan, Minnesota, and North Dakota, has generally been positive. *See* ECF No. 133 at PageID.18047 (noting that the 2016 expert reviews "did not raise any serious concerns about [the] use [of the

fallback provision] with respect to the kinds of beans produced by [Plaintiffs]"). Further, it seems plausible that the FCIC *was aware* of the different fallback terms but simply failed to make the requisite findings of fact. *See Ackerman*, 995 F.3d at 539 (Clay, J., dissenting) (arguing that based on "multiple pieces of evidence," the FCIC must have "know[n] that substituting the projected price for the harvest price was Watts' contingency plan"). *But see id.* at 534 (Kethledge, J.) (majority opinion) (noting that the "FCIC was . . . required to analyze the Michigan default pricing mechanism directly, in light of the interests spelled out in § 1508(h)(3)(A)[, but] . . . did not do [so]").

But importantly, the likelihood of the FCIC substantiating its decision is not great enough to resolve the vacatur issue altogether. *Cf. WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (declining to vacate agency action where "nothing in the record indicate[d] that on remand the agency [would] necessarily fail to justify its decisions"). As the Sixth Circuit explained, when Plaintiffs needed revenue protection in 2015, the policies they purchased were "virtually worthless." *See Ackerman*, 995 F.3d at 531. Presumably, the FCIC will have to consider that fact and others when deciding whether the DBRE policies, as currently drafted, "adequately protect[]" the interests of farmers. 7 U.S.C. § 1508(h)(3)(A).

Viewed altogether, the FCIC's errors slightly weigh in favor of vacatur.

**ii.**

In comparison to the mixed analysis above, the disruptive consequences of vacatur weigh rather clearly in favor of preserving the status quo. As Defendants note, since 2014, Michigan farmers have insured some 200,000 acres of land by purchasing DBRE policies. ECF No. 133 at PageID.18047. On balance, those policies seem to have performed well for many farmers. *See id.*

at PageID.18046 (noting that in 2014 "a harvest price was established for all types [of dry beans] except for dark red kidney beans (in all regions) and pinto beans in Michigan").

Given the substantial number of claims and premiums paid, vacating the FCIC's decision would likely trigger a "cascade" of disputes between farmers, brokers, and insurers—many of whom were likely unaffected by the fallback provision in 2015. *Id.* If the FCIC approves the Michigan expansion on remand—which, as discussed above, is a serious possibility—then such disputes could be avoided entirely.

Consequently, in balancing the equities, this Court finds that remanding the FCIC's decision without vacatur is the most appropriate remedy. Admittedly, this is a close case, and Defendants certainly deserve some criticism for their misconduct, including their misquoting of the Minnesota submission at the summary-judgment stage. *See Ackerman*, 995 F.3d at 533 (noting that Defendants "studiously elided" admitting their error on appeal). But Defendants' mistakes, however frustrating, do not grant this Court a license to disregard the overall equities in this case. And for reasons discussed above, the reliance interests of other farmers and insurers, combined with the serious possibility of the FCIC substantiating its decision, make for a persuasive case against vacatur.[2] Therefore, this Court will exercise its remedial discretion and remand the FCIC's decision to approve the Michigan expansion, without vacatur. On remand, the FCIC must treat the Michigan submission as a new 508(h) submission and carefully consider whether "the interests of [farmers] are adequately protected." 7 U.S.C. § 1508(h)(3)(A); *Ackerman*, 995 F.3d at 534 ("[T]he FCIC was therefore required to analyze the Michigan default pricing mechanism directly, in light of the interests spelled out in § 1508(h)(3)(A).").

---

[2] This Court is also mindful of the fact that the APA does not allow courts "to substitute [their] judgment for that of the agency." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020).

### III.

Shortly after filing their remedy brief, Plaintiffs filed a renewed motion for class certification.³ ECF No. 134. Plaintiffs seek to certify a class of Michigan farmers who purchased DBRE insurance and were not indemnified. *Id.* at PageID.18054. Accordingly, Plaintiffs' Motion to Certify turns on the viability of their proposed remedy: reforming the DBRE policies. *See id.* ("As class relief, Plaintiff seeks an order that compels Defendants to take the necessary steps to ensure that [the DBRE policies] are reformed . . . ."). Because this Court rejects that remedy, Plaintiffs' Motion to Certify will be denied as moot.

### IV.

Accordingly, it is **ORDERED** that the FCIC's decision to approve the Michigan expansion of the Dry Bean Revenue Endorsement is **REMANDED** to the FCIC for further review consistent with this Opinion and Order.

Further, it is **ORDERED** that Plaintiffs' Renewed Motion for Class Certification, ECF No. 134, is **DENIED AS MOOT**.

Dated: December 29, 2021                                  s/Thomas L. Ludington
                                                          THOMAS L. LUDINGTON
                                                          United States District Judge

---

³ Plaintiffs' motion is "renewed" because they previously filed a motion to certify before summary judgment was granted for Defendants. ECF No. 103.